[Civ. No. 1868.   Third Appellate District.—October 4, 1918.]

## SPEROS LAKAS, Respondent, v. GEORGE L. ARCHAMBAULT, Appellant.

HOMESTEAD—ATTACHMENT.—Under section 1241 of the Civil Code, a debtor has a clear right to defeat his creditor's attachment on the debtor's real property, by impressing it with the character of a homestead at any time prior to a lien being fixed upon the premises by judgment obtained.

ID.—RESIDENCE—INTENTION—GOOD FAITH.—Merely going through the forms necessary to the establishment of a homestead is not sufficient; there must be the element of good faith and a *present* intention to make the premises the residence, home, and abiding-place of the declarant and his family.

ID.—OCCUPANCY AND INTENTION.—The physical fact of occupancy and the intention with which the premises are occupied are both elements to be considered in determining the actual residence.

ID.—CHANGE OF RESIDENCE—INTENT TO DEFEAT CREDITORS.—A debtor has the right to move to premises, on which he desires to establish a homestead, for the sole purpose of defeating a creditor's claim, but such right is dependent upon a *bona fide* intention to make the place his residence and home.

ID.—EVIDENCE OF INTENTION.—In an action to have a homestead claimed by the defendant, declared void, the trial court was not bound to accept as conclusive the defendant's testimony that he moved to the premises with the intention of making the house erected there his home, if other facts and circumstances were inconsistent with such intentions.

APPEAL from a judgment of the Superior Court of San Joaquin County.   D. M. Young, Judge.

The facts are stated in the opinion of the court.

Arthur L. Levinsky, for Appellant.

Lafayette J. Smallpage  and  A. H. Carpenter, for Respondent.

CHIPMAN, P. J.—Action to have a homestead claimed by defendant on certain twenty acres of land declared void and invalid.   The cause was tried by the court without a jury,

and plaintiff had findings and judgment in his favor. Defendant appeals from the judgment.

The pleadings raised the single question whether or not the homestead sought to be vacated was valid.

For several years prior to the declaration of homestead by defendant he had supported and maintained his grandmother, Mrs. Jack; they had lived together on a tract of land of about 57 acres, four miles distant from the city of Stockton, of which land the twenty-acre tract in suit was a part; the house occupied by defendant at that time and other improvements were on a part of the larger tract, being 37 acres, which latter he sold some time prior to the declaration of homestead; upon the sale of this 37 acres defendant with his grandmother moved to Stockton and took up his residence in one of the flats of a building under the management of his sister-in-law, the wife of his brother, C. C. Archambault, to whom defendant paid rent for his flat. His grandmother lived with him there and was supported by him. She was over ninety years of age and feeble, sometimes bedridden for a considerable period, but "up and down," as described by witnesses. Defendant was a "meat-cutter" by occupation. He moved into town, as he testified, because he "had bad luck, didn't make no money and my health was bad and I had a chance to work in town and to be where my work was." . Defendant was engaged in the pursuit of his trade after moving to Stockton and up to the time he made the declaration of homestead and also thereafter. On April 22, 1915, plaintiff levied a writ of attachment against the said twenty-acre tract, and soon thereafter defendant commenced the construction of a dwelling-house thereon, which was substantially completed by the 1st of May, and on the first Sunday in May, 1915, defendant with his grandmother moved to this house and occupied it for about five weeks, when they returned to the apartment formerly occupied by them in Stockton, and defendant continued the pursuit of his trade as meat-cutter. During their stay in the house on the twenty-acre tract defendant went to town daily, except Sunday, to work at his trade as meat-cutter, taking his morning and evening meals at this house and his luncheon in town. At the time he removed to the twenty-acre tract defendant took with him the furniture and housekeeping utensils with which he had been housekeeping in said flat and his own and

his grandmother's wearing apparel. Three sacks of coal at one time and two sacks at another time and some wood were sent out for use in the cook-stove. The house was a one-story building twenty feet long and ten feet wide, consisting of one room in which the occupants lived. "The sides of the house were plain lumber, surfaced lumber, and the cracks were battened—battening, they call it. There are four windows in the house and two doors. The interior was plain boards and uprights that they were nailed to, and a roof. Tongue and grooved flooring and place for stove. No partition in it at all; just one room."

One Blankenship had a verbal cropping contract or lease of this land with defendant by which defendant was entitled to one-half of the crops, the lease embracing the entire twenty acres. Blankenship helped defendant to build the house, hauled the wood and coal to it, and, some time after defendant moved back to his flat, occupied and cared for the house defendant had built on the premises. Blankenship had previously occupied a house situated on adjoining land, the twenty-acre tract having no improvements on it.

It is contended by plaintiff that because of this existing lease or cropping contract defendant could not establish a homestead on the premises. We do not find it necessary to consider this point.

The foregoing facts are undisputed. Witness Kirkins, proprietor of a restaurant in Stockton where defendant occasionally took a meal, testified that about the time plaintiff sued out his attachment against defendant, the latter told witness about it, and in the presence of defendant's brother there was some talk of securing plaintiff by giving him a mortgage on the premises involved. He was asked as to any further conversation and replied: "Well, then, when they leave I don't know nothing about it, except I remember now he tell me they are going to give him the mortgage. That is all I know about it. So next morning George Archambault come to the place again and eat the breakfast. I ask him how he get along. He tell me, 'I don't think I am going to give him any mortgage. I think I can beat it,' he says, 'without giving any mortgage.' That is all. Any time I see him I tell him, 'How you get along?' He says, 'I got pretty nice lawyer, I think he pull me through all right.' I tell nothing else. That is all. All we were talking about that I

know. I always tell him, 'How you get along?' That is all. He tell me he think he get along all right, he think he going to beat the case—the note—whatever it is. Of course, Archambault a friend of mine, just as Lakas. I know Archambault more than I do Lakas, I am willing to tell the truth. That is all I can say. I don't know what they do after that. . . . Q. Do you remember any further conversation that took place at all? A. Oh, yes, I remember the time he told me he was going to make the application for the homestead. That he could do. I didn't know what homestead meant, myself, to tell you the truth. He says he make a homestead. I said, 'What you going to do? What homestead that mean?' He says, 'Well, I am going to move out and make a homestead and live there. So, if I live there thirty days,' he says, 'then they won't bother me—Lakas won't bother me with his note, I declare a homestead.' So right after—oh, about two weeks, come to a little place my brother used to own. I work there. I said, 'How you get along?' He said, 'I get along all right.' Because I had kind of trouble myself, and I ask him how he make his homestead. He says, 'Well, I make it—if you stay there thirty days, it will be just the same, you can declare a homestead.' I said, 'How you go out and live in it?' He said, 'I have bedsteads, couple quilts,' whatever it is, he said, 'that is all you need.' I said, 'If you live in the place, if a person live in the place, you think they can bother them?' He said, 'No, they can't bother them. You are all right.' That is about all we were talking about. Of course, my talking, I don't remember well different exactly. That is all he was talking. I always try to fix it up between Lakas and George. I was try very hard, telling them the best way do not get in trouble."

Plaintiff called defendant as his witness, who testified to many of the facts above narrated. He was asked if he paid rent for the flat he had rented from Mrs. Archambault for the month that he was out at his ranch and answered that he did not. He was asked on cross-examination why he removed from the homestead and answered: "My grandmother was sick, you see. It was impossible for me to get anybody, and I didn't want to impose on good nature myself." He was asked who looked after her when she was sick. "A. Mrs. Yettner [a near neighbor] was there every day, and Bill

Blankenship was there more or less, and that was all. . . .
The Court: Q. You stated that your grandmother was ill?
A. Yes, more or less.　Q. She is in feeble health, is she?
A. Yes, sir.　Q. How long has she been in feeble health?
A. Well, for the last three or four months she has been pretty
bad.　Q. Prior to that time, how was she?　A. Had asthma,
and short of breath, but she pulled through all right.
Q. At the time she moved off the ranch back home, was her
condition about the same as when you went out?　A. No, it
was a little worse.　Being alone it bothered her.''

Mrs. C. C. Archambault, defendant's sister-in-law, was
called by plaintiff.　She testified that when defendant moved
to the ranch in. May he took his grandmother out there in a
surrey; that they had been living in a flat for which defend-
ant paid witness rent.　She was asked if defendant paid her
rent for the flat while he was on the ranch and answered:
''No, sir; he did not pay me rent for the rooms while he was
absent.''　She was asked if she did not state to plaintiff that
she had received rent from defendant for that time.　De-
fendant objected on the ground that it was an attempt to
impeach his own witness.　The objection was overruled and
she answered: ''I don't remember, sir, whether I made such
a statement or not.''　She testified that she visited defendant
every Sunday while out there and occasionally during the
week when Mrs. Jack was sick; that Mrs. Jack had not been
bedridden continuously, but ''was up and down,'' and had
been in that condition ''for a couple of years,'' and that
''she got worse out there'' and ''had been going .down
rapidly.''

W. T. Blankenship testified, as plaintiff's witness, that he
built the house for defendant on the premises in question and
that he lived in a house near by but not on the homestead
premises; that he had a lease or cropping contract of the land,
as hereinabove stated.　On cross-examination he testified
that his lease did not give him the occupancy of the land and
that he lived in defendant's house in order to take care of it.
''He told me to stay there.　He wanted the land leveled, and
some trees set out.　He said if I would stay there he would
pay me for that.''

Plaintiff testified in his own behalf.　His attention was
called to the conversation between him and Mrs. C. C. Arch-
ambault concerning the payment of rent by defendant while

on his homestead. He testified, over objection, that Mrs. Archambault told him defendant did ,pay rent for his flat for that time.

At this point plaintiff rested and defendant moved for a nonsuit "upon the ground that the only allegation of the complaint in this action was that the defendant did not live on the premises, and that his grandmother did not live with. him and that she is not dependent upon his for support." It was contended that the evidence submitted by plaintiff showed that they did live there. Defendant is in error in his statement. The complaint alleged that neither did the defendant nor his grandmother "use said premises as a home, or reside upon them or any part thereof." In ruling upon the motion for nonsuit, the court said: "The question of intent is necessarily involved in the matter of the defendant living upon the premises, and that must necessarily be a question of fact to be determined, and therefore the motion for a nonsuit will be denied."

Defendant was called as a witness in his own behalf. He testified that when he moved to the premises, and all the time he was there, it was his intention to make the place his home; that he moved back to town because of his grandmother's health, which grew worse while on the premises; that he went to town to work daily, but returned at night; that while he was away his grandmother was alone except as neighbors might call; that he paid no rent for his flat while on these premises. He testified, on cross-examination: "Q. When you built that house you did not intend to make it any bigger, did you? A. Yes, some day I did, in case there was a change in my grandmother, immediately I would go out there to live, immediately. I came in on account of my grandmother, for her health and everything; her health was getting worse all the time. I intend to live over there in the near future." His attention was called to the testimony of witness, Kirkins. He denied having any such conversation as testified to by ,Kirkins.

Mrs. Mary Yettner testified that she lived "across the road" from the premises involved; that she visited Mrs. Jack daily and had been there "when the grandmother was starting a meal." She testified as to the condition of Mrs. Jack's health: "The first one or two days she was there she was able to be up, but after that she was up and down. Whenever

she felt able she was up. And that was the reason I visited the place every day, because I knew the old lady was there alone, and on that account I went there every day to see how she was." She testified that defendant was working for her husband and had been for two years past.

We have endeavored to set forth substantially all the evidence in the case which appeared to us to have any bearing upon the issues presented. We think the evidence sufficient to establish the fact that defendant, when he made his declaration of homestead, was the head of a family within the meaning of section 1261 of the Civil Code. He was the sole support of his aged grandmother, who had for some years been the object of his solicitude and care. Also, that he sufficiently complied with the statute in the erection of his dwelling-house on the premises. It served the purpose of a shelter and comfortable abiding-place for the time, and was commensurate with defendant's means and financial abilities. When he occupied it he took with him all his and his grandmother's personal belongings, their furniture, and household and housekeeping utensils, and had a sufficient equipment for the reasonable enjoyment of the dwelling by persons in their walk in life.

The crux of the matter, however, is seen in the statement made by the learned trial judge in ruling upon the motion for a nonsuit, namely: "The question of intent is necessarily involved in the matter of the defendant living upon the premises, and that must necessarily be a question of fact to be determined."

The defendant had a clear right to defeat his creditor's attachment by impressing the premises with the character of a homestead. The very purpose of the statute is to enable the debtor to establish a place of refuge for himself and family which the creditor shall not invade; and this he may do at any time prior to a lien being fixed upon the premises by judgment obtained. (Civ. Code, sec. 1241.) But merely going through the forms necessary to the establishment of a homestead is not sufficient. There must be in these forms the element of good faith and a present intention to make the premises the residence, the home, and the abiding place of the declarant and his family.

In *Tromans* v. *Mahlman*, 92 Cal. 1, 8, [27 Pac. 1094, 1095], the court said: "To effect its purpose, the statute has been

liberally construed in some respects, but the requirement as to residence at the time the declaration is filed has been strictly construed. Thus the court has many times used and emphasized the word 'actually,' to show that the residence must be real, and not sham or pretended.'' The same case was again before the court, reported in 111 Cal. 646, [44 Pac. 327]. Said the court: ''The only respect in which it is claimed by the appellants that the evidence herein differed from that at the former trial to such an extent as to authorize a different conclusion is that Mrs. Mahlman testified that at the time she went to the premises on the 21st of August, 1883, it was her intention to remain there and occupy the house continuously, but that by reason of supervening circumstances she was compelled to return to San Francisco the next day after the declaration of homestead was filed. Whether she did in fact actually reside on the premises at the time the declaration was filed was a question of fact to be determined by the court from the evidence before it. The physical fact of her occupancy, as well as the intention with which she occupied the house, were both elements to be considered in determining actual residence, and the court was not bound to accept her statement that she intended to reside thereon as conclusive, if other facts to which she testified were inconsistent with such intention. Whatever inconsistency there was between these facts and her statement of her intention presented merely a conflict of evidence, on which the decision of the trial court was final. Its decision upon this conflict of evidence that she did not reside there is conclusive upon this court.''

In that case the time of occupancy was much shorter than in the present case. But, as we view the statute, the time of occupancy prior to or after the declaration is not the only essential element. The physical fact of the occupancy and the intention with which the premises are occupied ''are both elements to be considered in determining the actual residence.''

The trial court found that defendant did not move to the premises in question with the intention to make the house there erected his home or residence. The defendant testified that such was his intention, but the court was not bound to accept his testimony as conclusive if the other facts and circumstances were inconsistent with such intention. In

viewing these facts and circumstances we must, in support of the judgment, give them the interpretation given to them by the trial court if such interpretation is reasonable, even though a different interpretation, favorable to defendant, might also be reasonably given to them. The declaration of intention made by defendant to the witness Kirkins, considered with other facts and circumstances otherwise appearing, is susceptible of the construction that he moved to the premises for the sole purpose of defeating plaintiff's claim, and, while he had a right to do this, such right was dependent upon a *bona fide* intention to make the place his residence, his home. This intention was not expressed by him to Kirkins or anyone else, and, disregarding the defendant's testimony as to his intention, as the court must have done, we cannot say the court was not justified in its conclusion.

Error is assigned in permitting plaintiff to impeach Mrs. Archambault, who was his own witness. She had testified, in answer to plaintiff's question, that defendant did not pay rent for the flat he had been occupying while he lived on the premises in question. Plaintiff claimed that he was surprised by the answer. The circumstances under which the question arose brought it within the rule in such cases.

Error is claimed in permitting the witness, Kirkins, to testify as to the statements made to him by defendant, for the reason that defendant was called as a witness by plaintiff but "was not asked anything about any such conversation." It was permissible to show by his own declarations what defendant's intention was in establishing a homestead. Defendant was not prejudiced by the refusal of the court to allow him to show that he had made some attempt to obtain a house to move to the premises. He had testified as to his intent in building the house which he occupied. The facts sought would not have strengthened his testimony.

The judgment is affirmed.

Burnett, J., and Hart, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on December 2, 1918.