[Civ. No. 22437. Third Dist. Mar. 1, 1984.]

ALVIN B. NADLER, Plaintiff and Appellant, v.
CALIFORNIA VETERANS BOARD, Defendant and Respondent.

COUNSEL

Danny L. Haukedalen for Plaintiff and Appellant.

H. Dean Stiles for Defendant and Respondent.

OPINION

**SPARKS, J.**—In this appeal we are called upon to determine whether the Department of Veteran Affairs (Department) may cancel a Cal-Vet home purchase contract when it discovers that the veteran purchaser utilizes the property as a secondary or "get-away" home rather than as a principal place of residence. We hold that it may, and shall affirm the judgment of the trial court denying Alvin B. Nadler's petition for a writ of administrative mandate directed against the California Veterans Board (Board).

*The Cal-Vet Program*

The Cal-Vet program was summarized in our recent decision in *Department of Veterans Affairs* v. *Duerksen* (1982) 138 Cal.App.3d 149, at pages 151 and 152 [187 Cal.Rptr. 832] as follows: "The Veterans' Farm and

Home Purchase Act of 1974 (Act) (Mil. & Vet. Code, § 987.50 et seq.)[1] was enacted 'to provide veterans with the opportunity to acquire farms and homes.' (§ 987.51.) Under the Act, the Department is empowered to buy farms and homes from their owners and sell the properties back to eligible veterans under long-term installment contracts at a low rate of interest. [Fn. omitted.] Since the sale is by installments (§§ 987.69, 987.71), the Department retains legal title to a property until the price has been paid in full. (See *Eisley* v. *Mohan* (1948) 31 Cal.2d 637, 643 . . . .) Funds for Department's purchase are provided by the public through general obligation bonds. (See, e.g., § 998.001 et seq., § 998.021 et seq., § 998.041 et seq.)

"A veteran who seeks a Cal-Vet contract must agree that he or the members of his immediate family will actually reside on the property until it is paid off or sold. (§ 987.60.) If he later wishes to transfer, assign, encumber, lease, let or sublet his property before he has paid the full price, he must first obtain the written consent of the Department. The Department 'may give its written consent . . . for good cause shown, subject to the interest of the department and consistent with the purposes' of the Act. (§ 987.73, subd. (a).) In the event of an approved assignment to a person who is not a veteran, that person does not enjoy the special low rate of interest, but pays a higher rate 'as fixed by the department . . . .' (§ 987.72.)

"Only one farm or home purchased under the Act may be owned by a veteran at any one time. (§ 987.86, subd. (c).) However, a veteran who has paid his contract in full may in certain circumstances be granted a subsequent opportunity to purchase another farm or home under the Act. (§ 987.86, subds. (a), (b), (d), (e).)

"If a veteran fails to comply with any of the terms of his contractual obligations the Department may cancel the contract; in such event all payments made to the Department up to that time are forfeited as rental paid for occupancy, and the Department is entitled to take possession of the property. (§ 987.77.)"

*The Facts*

In 1978 Nadler applied for and was granted a Cal-Vet purchase contract on a house located in Lake County. At that time he owned another lot in that county, and he intended to construct a larger house and transfer the Cal-Vet financing to the new house. In 1979 Nadler applied for a transfer of his Cal-Vet contract and by letter of October 31, 1979, was advised that

"[1]All further references are to the Military and Veterans Code unless otherwise noted."

his homesite had been approved as a building site, and that he was financially qualified for a loan of the contract balance.[2]

In the meantime the Department had discovered that Nadler did not utilize his original Cal-Vet purchase as his principal place of residence. On November 15, 1979, the Department notified Nadler of an intent to cancel his Cal-Vet contract. Nadler participated in a number of meetings and correspondence with department personnel to forestall this decision, but ultimately, on October 15, 1980, the Department notified Nadler that it was cancelling his Cal-Vet contract. Nadler requested a hearing pursuant to section 86 of the Military and Veterans Code.[3]

At Nadler's administrative hearing it became abundantly clear that he does not maintain the Cal-Vet house as his principal place of residence. At the time Nadler entered into the Cal-Vet purchase contract he and his wife and their children lived in San Rafael. They continued to live in their San Rafael house. One of the children still lives with the Nadlers in San Rafael, where he attends San Rafael High School. Nadler is a real estate broker and an insurance broker, and he maintains his principal place of business in San Francisco. The Nadlers spend most of their time in San Rafael, and Nadler conceded that he could consider the Lake County house as his weekend home. When the matter was before the Board Nadler conceded that the Cal-Vet house is not his principal residence when he said: "[T]his was not our

---

[2]Cal-Vet generally provides a one-time only opportunity for a veteran to obtain its benefits in the purchase of a home. (§ 987.86, subds. (a)-(d).) When certain limited and expressly defined circumstances arise which make it necessary for the veteran to sell his home and move to another, then he may be granted a subsequent opportunity to obtain Cal-Vet financing provided he complies with certain rigid prerequisites. (*Ibid.*) The hearing officer at Nadler's hearing explained that the Department believes veterans may have valid reasons for wanting to move which do not come within the statutory reasons for a subsequent loan. Accordingly despite advice from the legislative counsel that it had no authority to do so, the Department adopted an informal practice of permitting a veteran to "transfer" his Cal-Vet loan from one property to another. Such a practice appears in clear contravention of the express terms of the Act and thus beyond the Department's authority. Nevertheless the Department did not assert this as a basis for rejecting Nadler's claim to Cal-Vet benefits and it appeared that if Nadler otherwise qualified for such financing the Department would have been willing to permit him to "transfer" his purchase contract.

[3]Section 86 provides: "Any person deeming himself a veteran and who applies for benefits may appeal any decision made by a division of the department to the California Veterans Board. Upon receipt of such an appeal, the board shall grant a hearing, if requested, and shall render its decision in writing to the appellant not later than the second meeting of the board following the receipt of the appeal or of the hearing if one is held. An appeal shall be deemed to have been received by the board on the date of the first meeting of the board subsequent to delivery of the appeal to the secretary of the board. Except for judicial review, the board's decision is final and the board shall have the power to change or modify with good cause any decision which is adverse to the appellant. The board may delegate the holding of hearings to the legal officer. Hearings shall be held in the department office nearest to the appellant's home unless the appellant requests otherwise."

primary residence so to speak, or our main residence. The fact of the matter is: we have two residence. [*Sic.*] I am in the real estate and insurance business. I do need to have places to get away and this home is my get-away and my second home."

Despite Nadler's concession that the Cal-Vet home is not his principal place of residence, he maintains that he is entitled to Cal-Vet financing through a Cal-Vet purchase contract. His position is based upon his view that part-time occupancy is all that is required to comply with the residency requirements of the Act and his contract. Nadler points out that since the Cal-Vet purchase contract was executed, he has occupied the property on weekends, his furniture is there, there is food on the shelves, all the services are on, and he has never rented the house to others. Mrs. Nadler stated that they hope someday to move permanently to the Lake County home, but both of the Nadlers agreed that for a variety of reasons they have no definite plans of doing so.

As we noted above, the Act requires a veteran who desires Cal-Vet financing to agree that he or members of his immediate family will actually reside on the property within 60 days from the date of purchase by the Department and will continue to reside on the property until the contract is completed or the property is sold. (§ 987.60.) Nadler's Cal-Vet contract contained these provisions, and Nadler had read them and was aware of the requirements. The Department took the position that Nadler had not complied with this agreement because he did not make the Lake County home his principal place of residence. The Board agreed and upheld the decision of the Department to cancel the Cal-Vet contract.

Nadler petitioned the superior court for a writ of administrative mandate. ▊ ▊ ▊ ▊ The trial court rejected the Board's objections to the proceeding in administrative mandate, applied its independent judgment to the evidence, and upheld the Board's decision.[4] Nadler appeals.

### DISCUSSION

▊ This case presents an issue which does not appear to have been previously determined by a California appellate court: whether an otherwise

---

[4]The Board makes no contention in this appeal that administrative mandate is not an appropriate remedy nor that the independent judgment test was inapplicable. We do not address these issues in this opinion. We do note, however, that the two standards of review by which a trial court reviews an administrative agency's findings, the substantial evidence test and the independent judgment test, concern only the review of factual findings. (*Strumsky* v. *San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 44-45 [112 Cal.Rptr. 805, 520 P.2d 29].) The scope of review does not affect review of administrative determinations which are not factual findings. (*Zink* v. *City of Sausalito* (1977) 70 Cal.App.3d 662, 665 [139 Cal.Rptr. 59].) Where, as here, the facts are not in dispute, it is irrelevant to the result whether the substantial evidence or the independent judgment test applies.

qualified veteran may qualify for Cal-Vet financing for residential property which he intends to occupy, but which he does not intend to make his principal place of residence. In other words, is Cal-Vet financing available to enable a veteran to purchase a secondary, weekend, or get-away home? In resolving this issue we must, of course, make our first reference to the language of the Act.

The purpose of the Act is stated in section 987.51: "The object of this article is to provide veterans with the opportunity to acquire farms and homes." Section 987.53, subdivision (b) provides: " 'Home' means a parcel of real estate upon which there is a dwelling house and such other buildings as will, in the opinion of the department, suit the needs of the purchaser and his dependents as a place of abode. . . ." In order to accomplish this purpose the Department may purchase a home from the owner if, among other things, the Department is satisfied of the desirability of the property and the veteran has agreed that within 60 days he or members of his immediate family will actually reside upon the property and will continue to reside on the property until all payments have been made or the property is sold. (§ 987.60, subds. (a) and (b).) When the veteran has commenced actually residing upon the property, the Department may waive the occupancy requirement for a period not to exceed four years upon a showing of good cause. (§ 987.62.) Property subject to a Cal-Vet contract may not be transferred, assigned, encumbered, leased, let or sublet, in whole or in part, except with the written consent of the Department and consistent with the purposes of the Act. (§ 987.73.)

The word "home" is defined in the dictionary as: "[T]he house and grounds with their appurtenances habitually occupied by a family: one's principal place of residence: DOMICILE." (Webster's Third New Internat. Dict. (1971, G. & C. Merriam Co.) "Home," def. 1a, p. 1082.) The word home is "[a] relative term, whose meaning must often necessarily depend on the intent as determined by the context; and which may be, and is, often used in different senses, . . . It has been defined as meaning domicile . . ., a dwelling house, or dwelling place; a household; the house in which one lives, especially the house in which one lives with his family; the habitual abode of one's family; the place of constant or permanent residence; the place to which, when weary, one can go and rest; the place where one and his family habitually dwell, which they may leave for temporary purposes, and to which they return when the occasion for absence no longer exists; the place where one permanently resides, and to which he intends to return when away from it; residence; some permanent abode or residence where the person residing intends to remain." (40 C.J.S., Home, pp. 418-419, fns. omitted.) The concept of a home has traditionally meant the place of constant residence; the seat of one's family life. (See *Estate of Baird* (1924)

193 Cal. 225, 285 [223 P. 974].) "Home is the place where a person dwells and which is the center of his domestic, social and civil life." (Rest.2d Conf. of Laws, § 12.)

The law has traditionally dealt tenderly with one who in good faith attempts to acquire or preserve a home. (See *Great Northern R. Co.* v. *Hower* (1915) 236 U.S. 702, 713 [59 L.Ed. 798, 803, 35 S.Ct. 465].) Where, however, a statutory right requires actual residency for its assertion, the requirement has been strictly construed and rigidly enforced. (*Ibid.* See also *Small* v. *Rakestraw* (1905) 196 U.S. 403, 405-406 [49 L.Ed. 527, 529, 25 S.Ct. 285].) Thus, where a person is permitted to obtain a homestead patent to public lands through a period of actual residency upon the lands, it has been held that the construction of a habitable cabin on the land and occasional visits to the land are insufficient to fulfill the requirement of actual residency. (*Johnson* v. *United States* (10th Cir. 1931) 51 F.2d 54, 55-56.) In *United States* v. *Peterson* (10th Cir. 1929) 34 F.2d 245, at page 247, it appeared that a school teacher had attempted to perfect a homestead by constructing a comfortable, well-furnished house on public land and by spending two to four days each weekend upon the property. The court held such acts insufficient to fulfill the requirement of actual residency upon the land claimed as a home.

California courts have similarly construed a requirement of actual residence in analogous contexts. For example, our law has long protected a "home" from loss through execution by creditors by permitting the debtor to declare a homestead. "The [Homestead] Act is founded upon the idea that it is good for the general welfare that every family should have a home, a place to abide in, a castle, where it can find shelter from financial disasters and protection against the pursuit of creditors who have given credit with the full knowledge that they cannot cross its threshold." (*Gregg* v. *Bostwick* (1867) 33 Cal. 220, 228.) But such protection is not founded upon a notion every family ought to be able to hold some parcel of land free from the reach of creditors irrespective of whether it serves as the family home. (*Ibid.*) Thus, it has been consistently held that in order to constitute a valid homestead the claimant must actually reside on the land when the declaration is filed. (*Bullis* v. *Staniford* (1918) 178 Cal. 40, 45 [171 P. 1064].) And while the homestead law has been liberally construed to effect its purpose, the requirement of actual residence has been strictly construed. (*Ibid.*)

Physical occupancy is insufficient in itself to establish actual residency. (See *Johnston* v. *DeBock* (1926) 198 Cal. 177, 181 [244 P. 330].) Such occupancy must be accompanied by a bona fide intention to make the place the home. (*Lakas* v. *Archambault* (1918) 38 Cal.App. 365, 373 [176 P. 180].) Accordingly, efforts to establish a homestead through temporary or

part-time occupancy have been rejected. (See *Johnston* v. *DeBock, supra,* 198 Cal. at p. 181; *Bullis* v. *Staniford, supra,* 178 Cal. at pp. 45-46; *Tromans* v. *Mahlman* (1891) 92 Cal. 1, 8 [27 P. 1094, 28 P. 579]; *Lakas* v. *Archambault, supra,* 38 Cal.App. at pp. 372-373.) And at an early date the Supreme Court said: "because we have said that occupancy is only presumptive evidence of homestead, and, therefore, when the wife has recovered one homestead, this recovery would completely rebut the presumption which occupancy might raise, in reference to any other for which she might bring suit." (*Taylor* v. *Hargous* (1854) 4 Cal. 268, 273.)

From these authorities it can be seen that in a statute which is intended to assist in the acquisition or preservation of a home, the word "home" is used in a manner which would preclude a person or family from having multiple "homes." The home is the center of domestic, social and civil life: the principal place of residence. ■■ ■■■■ Where the establishment of a home requires actual residence, the requirement is strictly construed and is not fulfilled by temporary or part-time occupation.[5] This does not necessarily mean that a person must spend all of his time at a location to establish it as his home, but it does mean that a person cannot establish a certain location as the center of his domestic, social and civil life, spend most of his time there, and yet claim another location as his actual residence or home.

We recognize that the decisional authorities we have cited above are not directly controlling on the meaning and intent of the Act with which we are concerned. ■■ However, "[w]hen seeking legislative intent as to a statute, it is useful to consider language and legislative construction of another statute enacted for a similar purpose and containing similar language, even though not strictly in pari materia with the one under consideration." (*Hill* v. *Hill* (1972) 23 Cal.App.3d 760, 764 [100 Cal.Rptr. 458], citation omitted. See also *Sutter Hospital* v. *City of Sacramento* (1952) 39 Cal.2d 33, 38 [244 P.2d 390].) The federal Reclamation and Homestead Acts permit a person to acquire a home through entry and actual residence upon public land while the Act here permits a veteran to acquire a home through public

---

[5]The word "residence" is a term with no definite meaning, generally requiring construction in regard to the particular statute or purpose in which it is employed. (See *In re Morelli* (1970) 11 Cal.App.3d 819, 830 [91 Cal.Rptr. 72].) It is frequently considered to be synonymous with "domicile." (See Elec. Code, § 200, subd. (a); *Burt* v. *Scarborough* (1961) 56 Cal.2d 817, 820 [17 Cal.Rptr. 146, 366 P.2d 498] (construing "residence" for venue purposes).) When the word "residence" is qualified by such words as "actual" or "bona fide," it is used in a sense which would preclude a person from establishing more than one residence, and the residence must be the principal place of residence. (See the authorities discussed *supra,* and see *Burt* v. *Scarborough, supra,* 56 Cal.2d at p. 820.)

financing upon a promise of actual and continued residency.[6] The California homestead provisions allow a person or family to preserve a home from execution by creditors by filing a homestead declaration, provided that the property is the actual residence of the declarant. (See *Rich* v. *Ervin* (1948) 86 Cal.App.2d 386, 390-391 [194 P.2d 809].) The similarity of subject matter and purpose of these statutory schemes indicates that in adopting language with a well established meaning the Legislature must have intended such language to mean the same thing.

Nadler finds support for his position in that the Act does not specifically define a home as the principal place of residence. We find more significant what the Legislature said rather than what it did not say. Rather than provide that the purpose of the Act is to enable a veteran to acquire "residential property," the Act specifies a "home." Rather than requiring the veteran to "possess" or "occupy," or even "reside" upon the property the Legislature specified "actually reside" and "continue to reside." These terms, and the judicial gloss derived from years of construction, do not admit of the interpretation urged by Nadler.

Other provisions of the Act are indicative of the legislative intent behind the Act. Section 987.53, subdivision (b), provides that a home must "suit the needs of the purchaser and his dependents as a place of abode." ■ The concept of "needs" generally entails some element of reasonable necessity and not that which is merely desirable. (See 28 Words and Phrases, Need, p. 469, and cases cited.) California has long recognized the basic need of a family for a home, but has not similarly regarded as necessary other property which the family may desire to own. (*Gregg* v. *Bostwick, supra,* 33 Cal. at p. 228.) Section 987.60 requires the veteran to promise that he or members of his immediate family will actually reside on the property and limits the "immediate family" to "Spouse, dependent children, either natural or adoptive; and the parents if they are dependent upon the veteran for 50 percent or more of their support." This is indicative of a legislative intent to provide the veteran and his family with that basic seat of family life which the concept of a home entails, and not some desirable get-away property.

Another indication of legislative intent is contained in section 987.86. Generally Cal-Vet financing is a one-time opportunity. When the property

[6]While the result is the same, the procedure is different. (*Eisley* v. *Mohan* (1948) 31 Cal.2d 637, 644 [192 P.2d 5].) The federal government enforces the requirement of actual residency by withholding beneficial title until all prerequisites have been fulfilled (*ibid.*), while the Act enforces the requirement of actual residency by providing for cancellation of the Cal-Vet contract in the event conditions are not fulfilled. (§ 987.77.) This difference in procedures does not indicate that the requirement of actual residency is not identical in each case.

is sold under certain specified circumstances the veteran may be allowed another opportunity to purchase a home through Cal-Vet. In that event the veteran must pay the Cal-Vet loan in full, apply for the second loan within six months of the sale, and apply the net equity of the first house to the purchase of the second. (§ 987.86, subd. (b).) And "Only one farm or home purchased under this article shall be owned by a veteran or a veteran and the veteran's spouse at any one time under the article." (§ 987.86, subd. (c).) Thus, even though the veteran has paid his Cal-Vet purchase loan, or is willing to refinance the property in order to do so, he may not obtain a second Cal-Vet loan unless he actually sells the first property even though one of the enumerated circumstances permitting a second application has occurred. This indicates that the Act is intended to provide the veteran with the opportunity to acquire only that basic center of familial life which the concept of a home entails rather than multiple parcels of real property which the veteran may deem it desirable to own.

In *Department of Veterans Affairs* v. *Duerksen, supra,* 138 Cal.App.3d 149, we rejected the contention that the decision in *Wellenkamp* v. *Bank of America* (1978) 21 Cal.3d 943 [148 Cal.Rptr. 379, 582 P.2d 970] applies to Cal-Vet contracts. We noted that the Act is a carefully controlled program designed to assist veterans in acquiring residences [homes], and not a grant of publicly subsidized property which the veteran may dispose of [utilize] as he likes. (*Duerksen, supra,* at p. 155.) We also noted that a contrary result would only exacerbate the Department's already serious inability to provide eligible veterans with the benefits of the program. (*Id.,* at p. 156.) Similar concerns exist here. No matter how convenient or desirable it may be for Nadler to own a secondary, weekend or get-away home, we do not believe it was the intent of the Cal-Vet program to provide him with a public subsidy to purchase it. ▮ Cal-Vet was intended to provide veterans with the opportunity to acquire a home, and since it is clear that Nadler made his home in the San Rafael house when he applied for his Cal-Vet loan on the Lake County property, has continued to make his home in the San Rafael house, and intends to continue to make his home in the San Rafael house, he is not entitled to Cal-Vet financing to purchase his Lake County property.

In light of this conclusion Nadler's remaining contentions may be easily resolved. ▮ He asserts that the Department's construction of the Act as precluding Cal-Vet financing of a secondary or weekend home is in effect an administrative regulation; as such it is invalid because it was not adopted in conformity with the Administrative Procedure Act (APA; Gov. Code, § 11370 et seq.). Nadler relies upon the decision in *Roth* v. *Department of Veterans Affairs* (1980) 110 Cal.App.3d 622 [167 Cal.Rptr. 552]. In *Roth* it appeared that the Department had begun assessing late charges to Cal-Vet purchasers in 1968, and the Court of Appeal held that the decision to do so

was a "rule, regulation, order or standard of general application" which had to be adopted in conformance with the APA. (*Roth, supra,* at p. 629.) The basis for this decision was the fact that neither the Act nor the Cal-Vet contracts at issue provided for late charges. If the Department had the authority to assess late charges, then that authority had to be derived from its rule-making authority, and as such the Department was required to comply with the APA. A reading of the decision in *Roth,* however, makes it abundantly clear that if either the Act or the particular Cal-Vet contracts at issue had provided for late charges then compliance with the APA would have been unnecessary. (*Ibid.*)

■ The final construction of a statute is the function of the courts and not of administrative agencies. (*Hall* v. *City of Taft* (1956) 47 Cal.2d 177, 188 [302 P.2d 574].) It is axiomatic that an administrative agency may not modify, alter or enlarge the provisions of the legislative act being administered. (*Ralphs Grocery Co.* v. *Reimel* (1968) 69 Cal.2d 172, 176, fn. 3 [70 Cal.Rptr. 407, 444 P.2d 79]; *California State Restaurant Assn.* v. *Whitlow* (1976) 58 Cal.App.3d 340, 347 [129 Cal.Rptr. 824].) Since we have concluded that the Act does not permit Nadler to obtain the benefits he seeks, no action or inaction of the Department can confer a right to such benefits upon Nadler.

Nadler notes that the Department subsequently added section 343 to title 12 of the California Administrative Code to provide: "The requirement that the veteran or members of the veteran's immediate family must occupy the Cal-Vet loan property means that the veteran or family must actually reside in or on the property and maintain it as their principal place of residence. For purposes of this section, 'principal place of residence' shall mean the place where one actually lives for the greater part of the time, or the place where one remains when not called elsewhere for some special or temporary purpose and to which one returns frequently and periodically, as from work or vacation. There may be only one 'principal place of residence,' and where more than one residence is maintained or owned, the burden shall be on the veteran to show that the Cal-Vet farm or home is the principal place of residence." We also note section 320 of that title, which provides: "Homes to be used primarily for rental or income purposes or as 'vacation' or 'weekend' homes and properties located outside the State of California are not suitable for purchase." Nadler contends that the adoption of these regulations establishes his right to benefits in that it proves the regulations were necessary, indicates that such was not the law prior to the adoption of the regulations, and in any event cannot be applied retroactively to his case.

Nadler's argument must be rejected. We have already held that the Act does not confer upon Nadler the benefits he claims. No action or inaction

of the Department can do so. (*Ralphs Grocery Co.* v. *Reimel, supra,* 69 Cal.2d at p. 176, fn. 3.) The claim that the adoption of these regulations indicates a change in the law or a new interpretation of the law is rebutted by the record. It was made clear in the proceedings before the Board that the Department has, since the inception of the program in 1922, regarded the requirement of actual residency to mean the home must be the principal place of residence. ■ The adoption of a clarifying regulation after a controversy has arisen cannot be taken as a determination that the former policy was unreasonable or erroneous, but must simply be regarded as a commendable effort to avoid any similar controversy in the future. (Cf. *Hatch* v. *Ward* (1946) 27 Cal.2d 883, 887 [168 P.2d 22].) Finally, neither the agency nor the trial court attempted to resolve this dispute by reference to the subsequently enacted regulations. There is no question of the retroactive application of those regulations.

■ For these reasons we hold that Nadler is not entitled to Cal-Vet financing for the purchase of his weekend "get-away" home.

The judgment is affirmed.

Puglia, P. J., and Sims, J., concurred.