**NOT FOR PUBLICATION**

## UNITED STATES BANKRUPTCY APPELLATE PANEL
## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re:<br>MICHELE LYNN MCKEE,<br>　　　　　　Debtor. | BAP No.  CC-22-1042-GTS<br><br>Bk. No. 6:21-bk-10679-SY |
| MICHELE LYNN MCKEE,<br>　　　　　　　Appellant,<br>v.<br><br>KARL T. ANDERSON, Chapter 7<br>Trustee; LAURA O'KANE; CORRINE<br>LONG,<br>　　　　　　　Appellees. | **MEMORANDUM**<sup>*</sup> |

Appeal from the United States Bankruptcy Court
for the Central District of California
Scott Ho Yun, Bankruptcy Judge, Presiding

Before: GAN, TAYLOR, and SPRAKER, Bankruptcy Judges.

Memorandum by Judge Gan

Concurrence by Judge Taylor

---

<sup>*</sup> This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have, *see* Fed. R. App. P. 32.1, it has no precedential value, *see* 9th Cir. BAP Rule 8024-1.

**INTRODUCTION**

Chapter 7[1] debtor Michele Lynn McKee ("Debtor") appeals the bankruptcy court's order sustaining an objection to Debtor's homestead exemption filed by chapter 7 trustee Karl T. Anderson ("Trustee") and partially sustaining an objection filed by creditors Laura O'Kane and Corrine Long. After an evidentiary hearing, the court concluded that Debtor could not claim the California automatic homestead exemption because, on the petition date, she did not physically occupy the property in question, and she did not have an intent to return to the property.

On appeal, Debtor argues that she is entitled to the homestead exemption under California law because it was impossible for her to safely return to the property due to emotional abuse and physical intimidation by her former life partner and co-owner O'Kane. We acknowledge that Debtor made decisions during a difficult situation. But the bankruptcy court correctly applied California law, and its factual findings—that Debtor made an economic decision to relinquish her interest in the property and did not demonstrate an intent to reside there—are not clearly erroneous. Accordingly, we AFFIRM.

---

[1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure.

## FACTS

### A.    Prepetition Events

Debtor and O'Kane began a romantic relationship in late 2003 and began living together in 2004. In approximately 2009 they began working together as law partners in a firm called O'Kane & McKee, LLP ("O&M"). In 2010, Debtor and O'Kane purchased a lot and built a home on Bella Cara Way in Palm Springs, California ("Bella Cara"), which they finished in 2015. Debtor and O'Kane each owned one third of Bella Cara, and O'Kane's mother, Corrine Long, owned the remaining third.

In late September 2016, Debtor ended the personal relationship with O'Kane and a few months later she moved out of Bella Cara. Debtor initially rented a furnished house, and since February 2018, she has continuously lived in a rented condominium on Via Sonoma in Palm Springs ("Via Sonoma"). She changed her driver's license and voter's registration to reflect her address at Via Sonoma.

After the relationship ended, Debtor and O'Kane began discussions about dividing their jointly owned assets. The discussions culminated in an October 2017 written agreement (the "Agreement"), which provided for a division of personal property and titled vehicles, and a process to dissolve O&M. The Agreement further provided that the parties would sell jointly owned real property located in Oakland, California, and divide the net proceeds.

Regarding Bella Cara, the Agreement stated that Debtor would receive a "payout" of her interest based on her net equity under a hypothetical sale. The parties also agreed that Debtor would retain her one-third interest in proceeds from pending construction defect litigation. Pursuant to the Agreement, Debtor agreed to return her keys to Bella Cara and O'Kane agreed to be responsible for all taxes, insurance, and mortgage payments for Bella Cara after April 1, 2017.

The Agreement required Debtor to complete billing for an O&M matter (the "Robinson Matter") and obtain client approval for the invoice by December 1, 2017, and it provided she would receive her payout within 30 days of doing so.[2] The Agreement specified that if Debtor failed to complete the billing and obtain approval on the Robinson Matter by December 1, 2017, her payout would be reduced, and if she did not complete the billing by December 31, 2017, she would essentially forfeit her interest in Bella Cara.

Debtor asserts that she completed the billing on the Robinson Matter by December 1, 2017, but O'Kane refused to approve her time. O'Kane maintains that Debtor did not complete the billing on the Robinson Matter until September 2018 and consequently forfeited her interest in Bella Cara.

---

[2] The Robinson Matter involved O&M's representation of Jason Robinson in a probate case between 2014 and 2017. In May 2017, the state court approved a settlement agreement which provided for payment of $270,000 to O&M for attorney's fees.

O'Kane did not pay Debtor under the Agreement, and the handling of the Robinson Matter is part of ongoing litigation to dissolve O&M.

## B. The Bankruptcy and Exemption Objections

In February 2021, Debtor filed her chapter 7 petition. She listed her one-third interest in Bella Cara in Schedule A/B and claimed the California automatic homestead exemption under California Code of Civil Procedure ("CCP") § 704.730.

O'Kane and Long objected to Debtor's homestead exemption, arguing: (1) Debtor forfeited her interest in Bella Cara pursuant to the Agreement, and it was not property of the estate; and (2) Debtor admitted that on the petition date she resided at Via Sonoma and had not lived at Bella Cara since 2018.

Trustee also objected to Debtor's homestead exemption and partially joined O'Kane and Long's objection. Trustee argued that Debtor's interest in Bella Cara was property of the estate, but because Debtor admitted that she did not physically occupy Bella Cara on the petition date, and she was unable to demonstrate the requisite intent to live there, she was not entitled to the exemption. Trustee disputed the validity of the Agreement, but asserted that even if it was effective, it did not operate to disclaim Debtor's interest in Bella Cara. And regardless of the validity of the Agreement, it clearly demonstrated Debtor's intent not to reside at Bella Cara after October 2017.

Debtor responded to the objections and argued: (1) her interest in Bella Cara was property of the estate because it was O'Kane, not Debtor, who breached the Agreement, and even if Debtor breached it, O'Kane would have at most a claim for breach of contract; and (2) notwithstanding her lack of physical occupancy, she was entitled to claim the homestead exemption because she had a continuous intent to reside at Bella Cara. Debtor contended that although she and O'Kane were not married, they cohabited as life partners, and she should be entitled to the protection of CCP § 704.720(d). That statute allows a debtor who no longer resides in a homestead to retain the exemption when her "separated or former spouse continues to reside in or exercise control over possession of the homestead."

She further argued that the Agreement did not support a conclusion that she was abandoning her homestead; it merely demonstrated that she knew it was unsafe to return to Bella Cara, and she was doing what she could to amicably obtain her interest in the property and reinvest it elsewhere. Debtor claimed that her "involuntary absence" from Bella Cara did not constitute abandonment because, under the Agreement, she was supposed to receive the value of her interest within a short period of time.

Debtor filed a supplement to her opposition in which she argued that she did not abandon her homestead under California law because she was forced from Bella Cara by O'Kane's verbal abuse and physical intimidation. She asserted that, but for the abuse, she would still be living there.

6

The bankruptcy court set an evidentiary hearing on the objections. At the hearing, Debtor testified that O'Kane had been abusive "on multiple levels" throughout the relationship and became "very nasty" after Debtor ended the relationship. Debtor stated that after the breakup, she feared for her safety when O'Kane pushed her into the laundry room and would not let her leave. Three former employees of O&M all testified that they witnessed several instances of O'Kane yelling at Debtor and forcing her way into Debtor's office.

Debtor testified that after she moved out of Bella Cara, she intended that her interest in the property be "bought out" by O'Kane. She stated that she had no choice because she could no longer live at Bella Cara. Debtor testified that after the couple broke up, she wanted to stay at Bella Cara until it was sold but had to leave because of O'Kane's behavior. Debtor asked about the status of the buyout many times, and in 2018 she emailed O'Kane, accusing her of delaying the process to avoid paying the buyout. Debtor indicated that she intended to return to Bella Cara only if O'Kane agreed to vacate the property, but she had no expectation that O'Kane would ever leave.

At the conclusion of the evidentiary hearing, the bankruptcy court requested written closing arguments to address whether Debtor's intent to buy a new home with the proceeds from her interest in Bella Cara was sufficient to claim the homestead exemption under California law when she was unable to return to living at the property, and whether Debtor's

7

intent to reside at Bella Cara should be measured by an objective or subjective standard. The parties submitted their written arguments, and the court subsequently entered its oral ruling on the record.

The court reserved judgment on whether Debtor forfeited her interest in Bella Cara because Trustee had a separate pending adversary proceeding which involved the validity and effect of the Agreement. The court ruled that, although Debtor had an intent to retain her monetary interest in Bella Cara, she did not have an intent to reside there. It reasoned that whether Debtor had the requisite intent to return to the property required an objective test, and it noted that apart from Debtor's statement that she would return if O'Kane left, all other evidence indicated that Debtor's goal was to take proceeds from her interest in Bella Cara to buy a new house.

The court also rejected Debtor's argument to apply CCP § 704.720(d) because she and O'Kane were not married, and the statute could not be extended to non-spouses. The court entered a written order disallowing Debtor's homestead exemption, and Debtor timely appealed.

## JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(B). We have jurisdiction under 28 U.S.C. § 158.

## ISSUE

Did the bankruptcy court err by finding that Debtor did not satisfy the residency requirement for the California automatic homestead exemption?

## STANDARD OF REVIEW

A debtor's right to claim an exemption is a question of law we review de novo, and we review the bankruptcy court's factual findings, including a debtor's intent, for clear error. *Elliott v. Weil (In re Elliott)*, 523 B.R. 188, 191 (9th Cir. BAP 2014) (citing *Kelley v. Locke (In re Kelley)*, 300 B.R. 11, 16 (9th Cir. BAP 2003)).

Factual findings are clearly erroneous if they are illogical, implausible, or without support in the record. *Retz v. Samson (In re Retz)*, 606 F.3d 1189, 1196 (9th Cir. 2010). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985).

## DISCUSSION

### A. Legal Standards Governing the California Automatic Homestead Exemption

California has opted out of the federal exemption scheme and permits its debtors only the exemptions allowable under state law. CCP § 703.130. As a result, "[t]he bankruptcy court decides the merits of state exemptions, but the validity of the exemption is controlled by California law." *Diaz v. Kosmala (In re Diaz)*, 547 B.R. 329, 334 (9th Cir. BAP 2016).

9

Bankruptcy courts must liberally construe the law and facts to promote the beneficial purposes of the homestead exemption. *Phillips v. Gilman, (In re Gilman)*, 887 F.3d 956, 964 (9th Cir. 2018) (citing *Tarlesson v. Broadway Foreclosure Invs., LLC*, 184 Cal. App. 4th 931, 936 (2010)).

In California, there are two types of homestead exemptions: a declared homestead exemption, which must be recorded by a party, and an automatic homestead exemption, which arises by operation of law when a party's principal dwelling is subject to a forced sale. *Bhangoo v. Engs Com. Fin. Co. (In re Bhangoo)*, 634 B.R. 80, 85 (9th Cir. BAP 2021). Debtor did not record a declared homestead exemption and instead claimed the automatic homestead exemption under CCP § 704.730. For purposes of the automatic homestead exemption, the filing of a bankruptcy petition constitutes a forced sale. *In re Diaz*, 547 B.R. at 334.

"Under California law, the party claiming the automatic homestead exemption has the burden of proof on the existence of the exemption." *In re Bhangoo*, 634 B.R. at 85. Bankruptcy courts must apply the state law burden of proof on exemptions claimed under California law. *See In re Diaz*, 547 B.R. at 337 ("[W]here a state law exemption statute specifically allocates the burden of proof to the debtor, Rule 4003(c) does not change that allocation.").

"To determine whether a debtor resides in a property for homestead purposes, courts consider the debtor's physical occupancy of the property and the intent to reside there." *In re Gilman*, 887 F.3d at 965 (citing *In re*

10

*Diaz*, 547 B.R. at 335; *Ellsworth v. Marshall*, 196 Cal. App. 2d 471, 474 (1961)). A debtor who does not physically occupy a property on the petition date is not necessarily precluded from claiming the automatic homestead exemption. *See e.g., In re Bhangoo*, 634 B.R. at 86; *In re Diaz*, 547 B.R. at 334; *McBeth v. Karr (In re Karr)*, BAP No. CC-06-1079-KMoSn, 2006 WL 6810996, at *4 (9th Cir. BAP Oct. 2, 2006).

The automatic homestead exemption may be available to a debtor temporarily absent from the principal dwelling on the petition date if the debtor can establish an intent to return to the homestead property after the absence. *In re Bhangoo*, 634 B.R. at 86; *In re Diaz*, 547 B.R. at 334. Debtor acknowledged that she did not physically occupy Bella Cara on the petition date. Thus, the automatic homestead exemption applies only if she could prove her intent to return to Bella Cara.

B.    **The Bankruptcy Court Properly Applied California Homestead Law.**

Debtor argues that the bankruptcy court erred by disallowing her homestead exemption because she had the subjective intent to reinvest her interest in Bella Cara in a new residence, and she would have returned to Bella Cara if O'Kane had ever left the property. She contends that she did not abandon her homestead because she was forced to leave the property due to emotional abuse and physical intimidation, and it was impossible for her to return so long as O'Kane continued to reside there.

11

California courts have long held that a lack of physical occupancy does not necessarily preclude a party from claiming the homestead exemption. *See In re Bhangoo*, 634 B.R. at 86; *In re Diaz*, 547 B.R. at 335-36. And where a party does not physically occupy the property due to safety concerns, California courts have been notably lenient. *See Michelman v. Frye*, 238 Cal. App. 2d 698, 704 (1965) (upholding debtor's declaration of homestead made while she was absent from the property due to threats of violence made by her husband who continued to reside there); *Moss v. Warner*, 10 Cal. 296, 297-98 (1858) (holding that "removal made under very just apprehensions for the safety of his family from the existing hostilities of the Indians in the vicinity" was not an abandonment of the homestead).

Though we understand the plight of a debtor who must leave a homestead property due to safety concerns, and we liberally construe the law and facts to promote the beneficial purpose of the homestead exemption, we cannot obviate the residency requirement under California law. It is essential that a debtor who is temporarily absent on the petition date have an intent to reside in the property, even if the debtor was forced to leave due to dangerous conditions. *See Michelman* 238 Cal. App. 2d at 704 ("Absence from one's permanent residence, if all the while he intends the absence only for a special temporary purpose to be followed by resumption of the former residence, constitutes neither abandonment thereof nor a change of residence. The question . . . must depend largely upon his intention.") (cleaned up); *Moss*, 10 Cal. at 298 ("The residence of the family

12

in San Diego [away from the homestead] was merely temporary. Their home was not there, and, of course, not their homestead. They were merely sojourners in the city.").

We are unaware of any authority supporting a claim to the California automatic homestead exemption where the debtor does not demonstrate an intent to reside there. "[W]hether the debtor physically occupies the property or not, the debtor must have an intention to reside there." *In re Diaz*, 547 B.R. at 336; s*ee also In re Gilman*, 887 F.3d at 966; *Ellsworth*, 196 Cal. App. 2d at 475 ("While the very purpose of the homestead law is to protect the property from existing debts, the declarant must have 'a *bona fide* intention to make the place his residence, his home.'" (quoting *Lakas v. Archambault*, 38 Cal. App. 365, 373 (1918)).

Consequently, the bankruptcy court correctly determined that the automatic homestead exemption required Debtor to demonstrate an intent to return to Bella Cara.

## C.   The Bankruptcy Court Did Not Clearly Err by Finding that Debtor Lacked the Intent to Return to Bella Cara.

Debtor contends that her subjective statement—that she would return to Bella Cara if O'Kane vacated the property—is sufficient to overcome objective evidence that she intended to abandon the homestead. Although a debtor's intent to reside in a property involves a subjective state of mind, that subjective intent is typically demonstrated by objective manifestations. Debtor's testimony about her intent is probative, but it is

not necessarily dispositive. *See Tromans v. Mahlman*, 111 Cal. 646, 647 (1896) ("The physical fact of actual occupancy, as well as the intention with which she occupied the house, were both elements to be considered in determining actual residence; and the court was not bound to accept her statement that she intended to reside thereon as conclusive, if other facts . . . were inconsistent with such intention."); *see also, Nahman v. Jacks (In re Jacks)*; 266 B.R. 728, 742 (9th Cir. BAP 2001) ("[S]ubjective intent may be gleaned from objective factors."); *Carrillo v. Su (In re Su)*, 290 F.3d 1140, 1146 n.6 (9th Cir. 2002).

In resolving questions of a temporary absence from a homestead, we have endorsed the "useful analysis" articulated by the bankruptcy court in *In re Bruton*, 167 B.R. 923, 926 (Bankr. S.D. Cal. 1994). *See In re Bhangoo*, 634 B.R. at 89; *In re Karr*, 2006 WL 6810996, at *5. That analysis focuses on "whether the debtors demonstrated, rather than merely claimed, their intent to return to their home after the absence." *In re Karr*, 2006 WL 6810996, at *5. "In other words, courts should focus on what **objective** evidence showed an intent to return." *In re Bhangoo*, 634 B.R. at 89.

Here, the bankruptcy court considered Debtor's testimony, but concluded that the objective evidence—including the Agreement and email exchanges between the parties—showed that Debtor never intended to return to Bella Cara and instead sought payment from O'Kane for her interest. The court reasoned:

14

[W]e have so much other evidence, especially written evidence, that indicates she had no intent to ever move back into the house. She wanted to sell it. She just wanted money. The only evidence that slightly supports her claim of homestead exemption is just her testimony, subjective belief that this is her homestead and she would get money out of this, since she wanted to buy a home.

*Hr'g Tr.* 16:16-23, Feb. 9, 2022.

Debtor clearly expected to be paid for her interest, but the record does not evidence an intent to return to Bella Cara. She changed her address on her driver's license and voter registration, relinquished her keys and possession of Bella Cara, signed the Agreement which provided for her to receive payment for her interest, and had communications with O'Kane in which she continually asked for her buyout. And under the Agreement, Debtor ceased paying the mortgage, maintenance, taxes, and other expenses related to Bella Cara.

Debtor argues that she signed the Agreement to preserve her homestead interest, not to abandon it. But the automatic homestead requires a debtor to reside in a property, not merely to retain an economic interest in it. The purpose of the Agreement was to divide the parties' jointly held property interests. It was an economic transaction that provided for Debtor to leave Bella Cara and receive payment for her interest while O'Kane continued living there.

The bankruptcy court's finding is supported by evidence in the record, and we do not substitute our judgment for that of the bankruptcy

15

court. *See Legal Serv. Bureau, Inc. v. Orange Cnty. Bail Bonds, Inc. (In re Orange Cnty. Bail Bonds, Inc.)*, 638 B.R. 137, 149 (9th Cir. BAP 2022). And "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson*, 470 U.S. at 574. The bankruptcy court did not clearly err in finding that Debtor lacked the intent to return to Bella Cara, and it did not err in sustaining the objection to her homestead exemption.

**D.    CCP § 704.720(d) is Not Applicable to Debtor's Situation.**

Debtor asserts that under a liberal application of the homestead statutes required by California law we should treat her the same as a married spouse in the same situation who would otherwise be allowed the exemption under CCP § 704.720(d).[3] She maintains that the California Legislature intended individuals forced to leave a homestead under similar circumstances be entitled to the homestead exemption without needing to prove their intent to return to the property.

---

[3] CCP § 704.720(d) provides:

If a judgment debtor is not currently residing in the homestead, but his or her separated or former spouse continues to reside in or exercise control over possession of the homestead, that judgment debtor continues to be entitled to an exemption under this article until entry of judgment or other legally enforceable agreement dividing the community property between the judgment debtor and the separated or former spouse, or until a later time period as specified by court order. Nothing in this subdivision shall entitle the judgment debtor to more than one exempt homestead. Notwithstanding subdivision (d) of Section 704.710, for purposes of this article, "spouse" may include a separated or former spouse consistent with this subdivision.

By enacting CCP § 704.720(d), the California Legislature chose to extend the homestead exemption to debtors not currently residing in the property only: (1) while that debtor's separated or former spouse continues to reside in the property; and (2) until the community property is divided by judgment or enforceable agreement. Section 704.720(d) is inapplicable here; Debtor and O'Kane were not married, and Bella Cara was not community property. Liberally construing this provision does not permit us to extend the exemption beyond the express limitations of the statute.

## CONCLUSION

Based on the foregoing, we AFFIRM the bankruptcy court's order sustaining Trustee's objection to Debtor's homestead exemption.

Concurrence begins on next page.

TAYLOR, Bankruptcy Judge:

I join with reluctance.

I agree that the California legislature limited application of C.C.P. § 704.720(d) to a separated or former spouse. I recognize that this statute reflects a legislative recognition that the dissolution of a relationship frequently requires a termination of joint residence even where physical threat is not present; accordingly, it provides automatic protection of the homestead rights of a spouse who vacates the home. But we cannot expand the statute through judicial fiat to cover non-married persons.

And I acknowledge that the bankruptcy judge's findings of fact as to Ms. McKee's state of mind are entitled to deference and evaluated under the clear error standard. Here the findings have sufficient, if far from over-whelming, support in the record. I must affirm.

But I write separately because the focus of both the bankruptcy court decision and the memorandum from the Panel appear to me to inappropriately narrow the frame of inquiry when a domestic partner leaves a homestead and alleges that the departure is involuntary, expedient, or based on an actual risk of harm.

First, we cannot lightly deprive a person of a homestead against a background of alleged physical threat. California law has protected the homestead when the departure is involuntary and the result of a fear of

physical harm for over a century. *See Moss v. Warner*, 10 Cal. 296, 297-98 (1858); *see also Michaelman v. Frye*, 238 Cal. App. 268, 704 (1965).[1]

Here, the bankruptcy judge implicitly found that such threats were not the reason for the departure; he found, in effect, that it was a business decision. The record supports this conclusion: Ms. McKee owned only a third of the home – the remainder was owned by her former domestic partner and her former domestic partner's mother; the agreement involved a broader separation of assets, including dissolution of a law partnership; the agreement allowed for a total loss of Ms. McKee's interest in the home's proceeds if she did not perform certain law office related tasks; Ms. McKee was absolved from responsibility for all costs in connection with the home; and Ms. McKee neither retained her homestead rights in the document nor discussed the homestead otherwise when she entered into the transaction. That Ms. McKee is a lawyer is also supportive of her relinquishment of a homestead. Again, on this record, I affirm even though I might reach a different conclusion were the case tried to me.

But in the absence of factors supporting such a business basis for the departure from the home, I would reverse. And I would do so even if the

---

[1] I emphasize that there was no judicial finding substantiating Ms. McKee's allegations of violence as to Ms. O'Kane. I concur to express concerns as to future cases involving a substantiated threat of harm or any situation where one domestic partner co-owner makes the decision that they can no longer live in a jointly owned home without a risk to physical safety, emotional health, or general well-being or where the removal from the home is coerced or otherwise involuntary as a result of the termination of the relationship.

facts do not support a conclusion that the departure was not required to avoid physical harm.

The fact that the co-owner vacating possession rented another dwelling and acted as the law requires in changing an address on government documents should be given little or no weight when the departure from the jointly-owned home is merely-expedient, involuntary, or coerced. And a well-evidenced desire to return only when or if a former domestic-partner departs should be sufficient where there is no exchange of valuable alternative consideration in exchange for vacating the home. Finally, the fact that the non-resident co-owner is deeply interested in receiving proceeds to use toward purchase of a new home typically should support a conclusion that the homestead rights are retained; the purpose of the homestead exemption is to keep a roof over a person's head. Where the nonresident party wants to use home proceeds for exactly this purpose and is not resident in the home because joint habitation is difficult, impossible, or dangerous, we should interpret the exemption statutes broadly and absent unusual facts determine that the homestead was not abandoned.

I acknowledge that the California cases to date focus on the intent to return to the dwelling. But we need not tie-on blinders and ignore that the shattering of a relationship injects tremendous complication into the scenario. I am confident that when the relationship between domestic partner co-owners terminates, the party who vacates the home need not intend to return in all circumstances to preserve the homestead. In short, I

would find it sufficient for retention of the homestead, if such a person, to borrow from *Moss*, merely sojourns in another location until it is safe for body, mind, and spirit to return to the homestead. And, as a result, if the homestead is sold during this period of absence, I would allow the inadvertently absent co-owner to claim the proceeds free from creditor claims and to use them to acquire a safe place to live.