[No. G021233. Fourth Dist., Div. Three. Oct. 30, 1998.]

FOUNTAIN VALLEY CHATEAU BLANC HOMEOWNER'S ASSOCIATION, Plaintiff and Appellant, v. DEPARTMENT OF VETERANS AFFAIRS, Defendant and Respondent.

[No. G021948. Fourth Dist., Div. Three. Oct. 30, 1998.]

ROBERT S. CUNNINGHAM, Petitioner, v. THE SUPERIOR COURT OF ORANGE COUNTY, Respondent; FOUNTAIN VALLEY CHATEAU BLANC HOMEOWNER'S ASSOCIATION, Real Party in Interest.

## COUNSEL

Fiore, Walker, Racobs & Powers and C. Mark Hopkins for Plaintiff and Appellant and for Real Party in Interest.

Arnulfo Hernandez, Jr., Craig L. Stevenson, Elizabeth Carol Wied, Frank Perez Tays and Bruce A. Crane for Defendant and Respondent.

Cameron & Dreyfuss, Lawrence J. Dreyfuss and Alexandria C. Phillips as Amici Curiae on behalf of Defendant and Respondent and for Petitioner.

No appearance for Respondent.

## Opinion

**SILLS, P. J.**—Like Shel Silverstein's proverbial Sarah Cynthia Sylvia Stout, the petitioner in this case, Robert S. Cunningham, would not take the garbage out. So, reminiscent of Sarah's daddy who, in the famous poem would scream and shout, Cunningham's homeowners association did the modern equivalent. It instituted litigation. The association's theory in essence was that Cunningham's property constituted a fire hazard. Local fire authorities, however, determined that his property posed no fire hazard, either indoors or outdoors. Even so, the lawyers for the homeowners association wrote letters demanding that he clear his bed of all papers and books, discard "outdated" clothing, and remove the papers, cardboard boxes and books from the floor area around his bed and dresser. Books that were "considered standard reading material" could, however, remain in place.

Cunningham is a senior citizen who suffers from Hodgkin's disease. The letter from the association's lawyers was, in essence, a demand backed up by threat of litigation telling him to straighten up his own bedroom. So Cunningham found a lawyer and sued the association by filing a cross-complaint for invasion of the right to privacy and breach of the homeowners association's covenants, conditions and restrictions (commonly referred to as CC&R's).

The association's original complaint against Cunningham was soon settled; Cunningham agreed to abide by the rules. His cross-complaint against the association, by contrast, went to trial, with the issue being the *reasonableness* of the association's conduct after the litigation started. The trial was bifurcated between liability and damage phases, and the jury found in favor of Cunningham on the liability issue. However, before the damage phase could be heard, the trial judge granted the association's new trial motion, stating he believed the association had acted reasonably. And he went on to say that he would keep on granting new trial motions as long as the jury returned liability verdicts for Cunningham. Cunningham then petitioned for a writ to set aside the new trial order, which we now grant.

Treating the new trial order as what it *really* was—a judgment notwithstanding the verdict—it cannot stand. The association's behavior, in particular the sheer presumption of telling Cunningham what sort of reading material he could keep in his own home, was easily the sort of conduct that the jury could find was unreasonable and beyond the association's rights as stated in the CC&R's. We hasten to add, however, that this is all we decide. We do *not* hold that a letter from the lawyers for a homeowner's association

threatening litigation unless an adult cleans up his or her own room is necessarily actionable. That issue has not been briefed. It is enough for the moment that we merely hold that, given the actual CC&R's involved, the demands set forth in the letter were *unreasonable*.

The homeowners association also sued the Department of Veterans Affairs, hoping to make it also responsible to clean up what it perceived to be Cunningham's mess. The trial judge ruled in favor of the department on that one, holding that it was, in *substance*, a lender, not an owner. We affirm the judgment in favor of the department because the applicable statute, Civil Code section 2920, also looks to substance over form.

FACTS

Robert Cunningham bought an attached home subject to the CC&R's of the Fountain Valley Chateau Blanc Homeowner's Association with the help of the Department of Veterans Affairs. The deal was structured as a traditional land sale installment contract, with the department taking title and entering into a recorded contract with Cunningham which showed him as the real purchaser of the property.

In September 1993 a roofing contractor hired by the association complained that he could not maneuver his equipment in Cunningham's backyard due to "debris" there. That, and some previous complaints by neighbors, generated a letter from the association's lawyers demanding Cunningham not only clear his patio, but also open up the interior of his unit because there had been reports of fire hazards inside.

In November 1993 Cunningham allowed association representatives to inspect his home—albeit under threat of litigation. After the inspection Cunningham removed a number of personal items from the house.

On December 9, 1993, the association returned for another inspection and decided Cunningham still had not removed enough of his belongings. That inspection generated another letter threatening litigation.

Litigation came on March 14, 1994, based on alleged fire and safety hazards arising from the junk and paper stored in and about Cunningham's home. The association named both Cunningham and the department as defendants.

In May 1994, however, housing code and fire inspectors found no hazardous conditions on the property. Still, the association continued with the

litigation. And in early February 1995, the association's attorneys wrote a lengthy letter to Cunningham detailing the inadequacies of Cunningham's housekeeping and demanding he undertake a number of actions concerning the *interior* of his home. He was told to:

—Clear his bed of all paper and books.

—Remove paper, cardboard boxes and books from the floor area around his bed and dresser.

—Remove all boxes and papers not currently in use in the living room and dining room because they increased the risk of fire.

—Clear all objects, including cardboard boxes, from his interior stairs and stairwells to allow passage.

—Not use his downstairs bathroom for storage.

—Maintain a functioning electrical light in his downstairs bathroom.

On top of these demands, the letter contained this statement: "The Association suggests that all outdated clothing that has not been worn in the last five years be removed and/or donated to the Salvation Army or similar organization. This would allow the upstairs bathroom to be used for what [*sic*] designed for. Any other remaining clothes could be stored in a walk-in closet." The letter further told Cunningham that "[b]ooks that are currently in book shelves, and which are considered standard reading material, can remain in place." It ended by reminding him that the association's attorney fees had reached over $34,000 and were continuing.

Cunningham has Hodgkin's disease and had been, up to that point, representing himself. In February 1996, however, he found an attorney who agreed to represent him. His new attorney then obtained leave to file a cross-complaint against the association based on a variety of causes of action, including violations of the right to privacy, trespass, negligence and breach of contract, predicated on the association's use of the threat of litigation to gain entry to his home and force him to throw out various of his personal belongings. What the association had characterized as "debris" now had a name: "furniture, magazines, books, appliances, bookshelves, plants, bicycles, camping equipment and other personal items."

The complaint eventually was settled in August 1996, with Cunningham stipulating he was subject to the association's CC&R's and agreeing to

such things as keeping his patio clean, maintaining reasonable access through his garage, and not storing gasoline or kerosene in the interior of the residence.

The complaint against the department then went to a bench trial in September 1996, with judgment entered in favor of the department in December 1996. The judgment declared that the department was *not* the legal owner of the property or responsible for compliance with the CC&R's. The association then timely appealed from that judgment.

Meanwhile, Cunningham's cross-complaint against the association had been first bifurcated into liability and damage portions, with the liability portion tried separately in March 1996. During the trial, the judge *denied* the association's requests for a nonsuit and directed verdict, stating there *was* sufficient evidence for the case to go to the jury. The case went to the jury on an instruction asking it to determine the reasonableness of the association's "activities toward the plaintiff in regard to its alleged requests and/or demands to plaintiff for the removal of items from inside the residence" during the period June 14, 1994, through May 1996. The jury was then told that the association acted reasonably if Cunningham's activities "actually posed an unreasonable risk of fire danger" *or* if it "sincerely, though mistakenly, believed, under the circumstances known to it, that [Cunningham's] residence constituted an unreasonable risk of fire danger." On the other hand, the jury could find that the association was unreasonable if "no reasonable person" would have "believed under the circumstances known at the time" that Cunningham's residence "posed an unreasonable risk of fire danger."

On March 12, 1997, the jury returned a verdict in favor of Cunningham on the liability issue, having specifically found that the association had acted unreasonably. Less than a month later, the association responded with a motion for judgment notwithstanding the verdict or, in the alternative, for new trial.

On May 6, the trial judge stated that he believed the association acted "totally reasonably" and therefore he would "breach the pure law" and grant the new trial motion even though the damages phase had not yet been tried. Such a trial would be a "complete waste of time." Indeed, said the trial court, "if we try it again on the same facts, you can look for the same ruling." The court set a new trial for November 1997. Cunningham petitioned for a writ commanding the trial court to set aside the new trial order. We consolidated the writ proceeding with the association's appeal from the judgment in favor of the Department of Veterans Affairs.

## DISCUSSION

### *A Trial Court Cannot Grant a Judgment Notwithstanding the Verdict by Perpetually Granting New Trial Motions*

At the outset we must confront a serious anomaly in California's procedural law regarding attacks on decisions made by juries. Typically, if a defendant believes that the plaintiff has not presented substantial evidence to establish a cause of action, the defendant may move for a nonsuit if the case has not yet been submitted to the jury, a directed verdict if the case is about to be submitted, or a judgment notwithstanding the verdict (jnov) following an unfavorable jury verdict.

While made at different times, the three motions are analytically the same and governed by the same rules. (See *Beavers* v. *Allstate Ins. Co.* (1990) 225 Cal.App.3d 310, 327 [274 Cal.Rptr. 766] [". . . different aspects of the same judicial function and have long been held to be governed by the same rules"].) The function of these motions is to prevent the moving defendant from the necessity of undergoing any further exposure to legal liability when there is insufficient evidence for an adverse verdict. (E.g., *Reynolds* v. *Willson* (1958) 51 Cal.2d 94, 99 [331 P.2d 48].) Put another way, the purpose of motions for nonsuit, directed verdicts and jnovs is to allow a party to prevail as a matter of law where the relevant evidence is *already in.*

And naturally, given the constitutional right to jury trial and a policy of judicial economy against willy-nilly disregarding juries' hard work (even, in the case of a motion for nonsuit, the work of the jury in listening to the case up to that point), the basic rules regarding these motions are predictably strict. Conflicts in the evidence are resolved *against* the moving defendant and in favor of the plaintiff; all reasonable inferences to be drawn from the evidence are drawn against the moving defendant and in favor of the plaintiff. (See, e.g., *Nally* v. *Grace Community Church* (1988) 47 Cal.3d 278, 291 [253 Cal.Rptr. 97, 763 P.2d 948] [for nonsuit, " ' "every legitimate inference which may be drawn from the evidence" ' " should be drawn in plaintiff's favor, and the evidence should be evaluated " 'in the light most favorable to the plaintiff' "]; *CC-California Plaza Associates* v. *Paller & Goldstein* (1996) 51 Cal.App.4th 1042, 1050-1051 [59 Cal.Rptr.2d 382] [" 'A nonsuit or a directed verdict may be granted "only when, disregarding conflicting evidence and giving to plaintiff's evidence all the value to which it is legally entitled, herein indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the

plaintiff if such a verdict were given." ' " (italics omitted)]; *Hansen* v. *Sunnyside Products, Inc.* (1997) 55 Cal.App.4th 1497, 1510 [65 Cal.Rptr.2d 266] [for judgments notwithstanding the verdict, " ' " " '[i]f there is any substantial evidence, or reasonable inferences to be drawn therefrom, in support of the verdict, the motion should be denied' " ' "].)

By contrast, the motion for a new trial has a different purpose. As the Supreme Court noted in the famous case of *Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 458-459 [20 Cal.Rptr. 321, 369 P.2d 937], the function of a new trial motion is to allow a *reexamination* of an issue of fact.

The difference in purpose means a difference in standards. Unlike nonsuits, directed verdicts, and judgments notwithstanding the verdict—we will call these the "dispositive" motions—granting a new trial does not entail a victory for one side or the other. It simply means the reenactment of a *process* which may eventually yield a winner. Accordingly, the judge has much wider latitude in deciding the motion (e.g., *Jones* v. *Evans* (1970) 4 Cal.App.3d 115, 121 [84 Cal.Rptr. 6]), which is reflected in an abuse of discretion standard when the ruling is reviewed by the appellate court. A new trial motion allows a judge to disbelieve witnesses, reweigh evidence and draw reasonable inferences contrary to that of the jury, and still, on appeal, retain a presumption of correctness that will be disturbed only upon a showing of manifest and unmistakable abuse. (*Mercer* v. *Perez* (1968) 68 Cal.2d 104, 112 [65 Cal.Rptr. 315, 436 P.2d 315].) Hence, given the latitude afforded a judge in new trial motions, orders granting new trials are "infrequently reversed." (*Id.* at p. 113.)

Now here is the anomaly. The reason for the "dispositive" motions is that the plaintiff cannot win, because the plaintiff has presented insufficient evidence to support a favorable judgment. Yet a new trial motion may *itself* be based on insufficient evidence to support a favorable judgment. (Code Civ. Proc., § 657, clause 6 [". . . for any of the following causes . . . : [¶] . . . [¶] 6. Insufficiency of the evidence to justify the verdict or other decision, or the verdict or other decision is against law."].) Moreover, even though there are some extra requirements on the judge before he or she may grant a new trial on insufficient evidence,[1] the fact remains that the trial judge may, in granting such a motion, draw inferences and resolve conflicts in the evidence different from that of the jury. (E.g., *Widener* v. *Pacific Gas*

---

[1]The 10th paragraph of section 657 of the Code of Civil Procedure provides: "A new trial shall not be granted upon the ground of insufficiency of the evidence . . . unless after weighing the evidence the court is convinced from the entire record, including reasonable

*& Electric Co.* (1977) 75 Cal.App.3d 415, 440 [142 Cal.Rptr. 304] [" 'In passing upon a motion for a new trial made upon the ground of insufficiency of the evidence the trial judge is required to weigh the evidence; and in doing so he may *disbelieve witnesses and draw inferences contrary to those supporting the verdict.*' "].) Accordingly, it is natural to ask, if a trial judge is convinced that a litigant has no substantial evidence to justify a favorable judgment, why take the hard and narrow road of granting one of the dispositive motions with the attendant stringent standard of review when he or she can take a much easier and wider path by granting a new trial?

The answer is this: Inherent in the new trial statute is the following, but unstated, premise: When a trial judge grants a motion for new trial based on insufficiency of the evidence, it is *not* because the judge has concluded that the plaintiff *must* lose, but only because the evidence in the trial that actually took place did not justify the verdict.[2] Evidence might exist to justify the verdict, but for some reason did not get admitted; perhaps the plaintiff's attorney neglected to call a crucial witness or ask the right questions. *There is still the real possibility that the plaintiff has a meritorious case.* Indeed, such a conclusion is a simple corollary from the observation of our Supreme Court in the venerable *Auto Equity* decision that the essential function of the new trial is to *reexamine* the evidence. (*Auto Equity Sales, Inc.* v. *Superior Court, supra,* 57 Cal.2d at pp. 458-459.) At the same time, misuse of a new trial motion as a *dispositive* motion renders surplusage the Legislature's provisions for nonsuits, directed verdicts, and judgments notwithstanding the verdict. (See Code Civ. Proc., §§ 581c, 629-630 [providing respectively for dispositive motions].)

It is true that we might analyze the judge's grant of a new trial prior to the trial of the damages issue as a simple error of prematurity. The trial judge himself appears to have recognized that he was legally incorrect—"breach the pure law" was the telltale phrase—in not waiting for the damages phase to be completed.[3]

But that wasn't the real error. The real error was misusing a motion for new trial as a de facto dispositive motion; the trial court signaled its

---

inferences therefrom, that the court or jury clearly should have reached a different verdict or decision."

   [2]The questions arise: Suppose there is evidence to justify the jury's verdict, but the great weight favors the other side? Would granting a new trial be an abuse of discretion because it represented a substitution of the court's view for the jury's? We need not explore these matters. We need only note for the moment that a new trial motion based on insufficient evidence certainly entails the possibility that the plaintiff could still win on retrial.

   [3]And in that respect he was right: It is well established hornbook law that a motion for new trial is premature where the plaintiff has prevailed on the liability issue if the motion is made before the damages phase has even commenced. (Cal. Rules of Court, rule 232.5 ("Any

intention by stating on the record that plaintiff could *never* prevail given the reasonableness of the defendant's position.[4] Moreover, the trial court pointed to no problem in the process of the trial which warranted a retrial.[5] The bottom line is that the judge might as well have said the association acted reasonably *as a matter of law* and given judgment for the defendant there and then.

We will therefore *not* review the trial judge's new trial decision according to the usual abuse of discretion standard. It is clear from the record that the granting of the motion was a de facto judgment notwithstanding the verdict, and we will review the order according to those standards.[6] This resolution is important, because it means that we must conclude the jury rejected the association's "sincere-though-mistaken" belief in the fire danger posed by Cunningham's unit, and that, as a matter of the technical minutia of combustibility, no reasonable person would believe there really was a risk of fire.

There is precedent for looking to the substance of a new trial motion rather than just its title. In *Jean v. Collins Construction Co.* (1963) 215 Cal.App.2d 410 [30 Cal.Rptr. 149] the defendant moved for nonsuit. The motion was granted, then the plaintiff moved for a new trial on the ground that granting the nonsuit was error. *That* motion was also granted. On appeal, the court looked to the *substance* of the so-called new trial motion and determined it wasn't a new trial motion after all, but simply a request to reconsider the earlier nonsuit. (*Id.* at p. 414.) Along the same lines, we will treat the trial judge's order as what it really was: the granting of a judgment notwithstanding the verdict. In that sense, this writ proceeding has the *substance* of an appeal from such a judgment.

motion for a new trial following a bifurcated trial shall be made after all the issues are tried . . . ."); e.g., *Auto Equity Sales, Inc.* v. *Superior Court, supra*, 57 Cal.2d at pp. 458-459; *Cobb* v. *University of So. California* (1996) 45 Cal.App.4th 1140, 1144-1145 [53 Cal.Rptr.2d 71]; *Horton* v. *Jones* (1972) 26 Cal.App.3d 952, 955-956 [103 Cal.Rptr. 399]; *Meyser* v. *American Bldg. Maintenance, Inc.* (1978) 85 Cal.App.3d 933, 937 [149 Cal.Rptr. 808].)

[4]That is because the trial judge said so, clearly, on the record. But what is to prevent a trial judge, bound and determined to wear down one of the litigants, from granting a new trial motion on the ground of insufficiency of the evidence and then discreetly keeping mum? The answer is that the granting of a *second* new trial motion based on insufficient evidence after the plaintiff has again prevailed requires the appellate court to look at the whole record to see if the trial court is up to any sort of unarticulated mischief.

[5]The announced intention to assure that plaintiff never won would mean that granting of the new trial motion in this case would constitute an "abuse" of the trial judge's discretion, even assuming that were the applicable standard.

[6]In support of the grant of the new trial motion, the association makes a "judicial economy" argument, i.e., there is no reason to waste time with a damage trial if the plaintiff must lose anyway. The irony here is that this very argument underscores the essential nature of the motion not as a new trial motion, but as one for a jnov.

### *It Cannot Be Said That the Association Acted*
### *Reasonably as a Matter of Law*

The association argues it was perfectly reasonable for the trial judge to grant a motion for new trial after the completion of the liability phase because the trial judge decided "all issues" of liability against Cunningham. As we have pointed out above, the logical implication of this argument is that the trial judge did not, in substance, grant a new trial motion but a de facto judgment notwithstanding the verdict.

While we must pass on the propriety of the judge's decision to grant the de facto jnov, we stress that there are at least two issues which we expressly do not decide in this proceeding: (1) Whether the association can be held liable for gaining access and ostensible voluntary removal of property through no more than a *threat* of *court proceedings*. (I.e., whether the mere specter of lawful resort to the courts can ever be the kind of "coercion" that would violate the CC & R's.) (2) Whether the jury should have even decided the question of whether the association's actions were *reasonable*. It is, of course, one thing for the jury to determine, as factual matters, that there really was no fire danger posed by Cunningham's unit, or that the association *actually believed* in a fire danger. Those are matters of fact. It is another to allow *the jury* (as distinct from the judge) to make the *ultimate* call that, at the end of the day, the association acted "unreasonably." However, because the association has not raised these specific points in its defense, we do not address them.

Turning then to what we must decide, we begin with the now established fact that there was no actual fire danger that a reasonable person would perceive—the relevant city departments had, after all, found no fire hazard. Further, the association did not have a good faith, albeit mistaken, belief in that danger. The jury resolved those questions against the association and, in what is really an appeal from a judgment notwithstanding the verdict, those are the operative facts.

In light of those operative facts, it is virtually impossible to say the association acted reasonably. It is true the CC&R's require "owners" to "maintain the interiors of their residential units and garages, including the interior wall, ceilings, floors and permanent fixtures and appurtenances in a

clean, sanitary and attractive condition."[7] It is also true that they provide for entry by the board "when necessary in connection with maintenance, landscaping or construction for which the board is responsible."[8] But these sections of the CC&R's cannot reasonably be read to allow an association to dictate the amount of clutter in which a person chooses to live; one man's old piece of junk is another man's objet d'art. The association's rather high-handed attempt to micromanage Cunningham's personal housekeeping—telling him how he could and could not use the interior rooms of his own house—clearly crossed the line and was beyond the purview of any legitimate interest it had in preventing undesirable external effects or maintaining property values.

Particularly galling to us—and clearly to the jury as well—was the presumptuous attempt to lecture Cunningham about getting rid of his old *clothes*, the way he kept his own bedroom, and the kind of "reading material" he could have.[9] To obtain some perspective here, we have the spectacle of a homeowners association telling a senior citizen suffering from Hodgkin's disease that, in effect, he could not read in his own bed![10] When Cunningham bought his unit, we seriously doubt that he contemplated the association would ever tell him to clean up his own bedroom like some parent nagging an errant teenager.

If it is indeed true that homeowners associations can often function "as a second municipal government" (*Chantiles* v. *Lake Forest II Master Homeowners Assn.* (1995) 37 Cal.App.4th 914, 922 [45 Cal.Rptr.2d 1]), then we have a clear cut case of a "nanny state"—nanny in almost a literal sense—going too far. The association's actions flew in the face of one of the most

---

[7]Article XIII of the CC&R's states: "The owners shall maintain the interiors of their residential units and garages, including the interior walls, ceilings, floors and permanent fixtures and appurtenances in a clean, sanitary and attractive condition, reserving to each owner, however, complete discretion as to choice of furniture, furnishings and interior decorating and interior landscaping."

[8]Article XIV states: "The Board or its agents may enter any unit when necessary in connection with maintenance, landscaping or construction for which the Board is responsible. Such entry shall be made with as little inconvenience to the owners as practicable, and any damage caused thereby shall be repaired by the Board, at the expense of the maintenance fund."

[9]At oral argument, counsel for the association was confronted with the letter concerning "appropriate reading material" and what Cunningham could have strewn about his own bed. Counsel conspicuously did not make an argument that the letter was a matter of minimizing combustible materials *qua* combustible materials. Temperatures must, after all, get pretty high before paper starts burning. (Cf. Bradbury, Fahrenheit 451 (1953).)

[10]Or, to give the association the benefit of the doubt, of telling him that he had to limit the amount of books, newspapers and magazines within easy reach when he did read in bed.

ancient precepts of American society and Anglo-American legal culture. "A man's house is his castle" was not penned by anonymous, but by the famous jurist Sir Edward Coke in 1628.[11]

The jury could thus find that the association did not act reasonably under the circumstances (and that is all we decide). The de facto judgment notwithstanding the verdict masquerading as a new trial order therefore must be the de facto equivalent of reversed. The case must now proceed to damages.

### *The Department of Veterans Affairs Was Indeed a Lender, Not an Owner, and Therefore Not Bound by the CC&R's*

Cunningham purchased his home through the *state* "Cal-Vet" program enacted after World War I—not to be confused with the traditional "G. I. Loan" program operated by the federal government. (See generally, *Department of Veterans Affairs* v. *Duerksen* (1982) 138 Cal.App.3d 149, 155 [187 Cal.Rptr. 832].)[12] The Cal-Vet program (see Mil. & Vet. Code, § 987.50 et seq.)[13] is specifically targeted at California veterans. (See generally, *Del Monte* v. *Wilson* (1992) 1 Cal.4th 1009 [4 Cal.Rptr.2d 826, 824 P.2d 632] [holding that conditioning program on California residency at a "fixed point in the past" violated the federal equal protection clause].) The program is funded by general obligation bonds. (Former § 987.567.)

In keeping with its early 1920's enactment, and in contrast with the federal program (in which the Department of Veterans guarantees loans to buy homes), the state program operates by having the Department of Veterans Affairs *take title* to the home the veteran seeks to buy, with the veteran entering into a long term installment contract with the department at a low rate of interest. (138 Cal.App.3d at p. 151; see §§ 987.69, 987.51.) The device of taking title allows the department to assure that a veteran or a member of his or her family will actually reside on the property until the loan is paid off or the property is sold. (See *Nadler* v. *California Veterans Board* (1984) 152 Cal.App.3d 707, 712 [199 Cal.Rptr. 546]; § 987.60.) Of course, there are provisions for a waiver of occupancy requirements under certain circumstances, including reentry into active military service. (§§ 987.62-987.63.)

The installment sales contract obligates the veteran to keep the property "in good order and repair all buildings, fences, and other permanent improvements," and maintain insurance. (§ 987.75.) In the same vein, the

---

[11]Oxford Dictionary of Quotations (1992) at page 209, referencing The Third Part of the Institutes of the Laws of England (1628).

[12]*The G. I. Loan program is now set forth at 38 United States Code sections 3700 et seq.*

[13]All further statutory references are to the Military and Veterans Code unless otherwise noted.

veteran must pay all taxes and assessments and other charges against the property and keep the buildings on it in "good order and repair," and, if he or she doesn't, the department has the *discretionary* right to pay the taxes and assessments or even do repair work itself. (§ 987.75; cf. *Brown* v. *Department of Veterans Affairs* (1986) 178 Cal.App.3d 392 [224 Cal.Rptr. 149] [noting Cal-Vet did not have a duty to procure insurance, but could do so at its discretion and assess the cost to the veteran].)[14]

Because Cal-Vet loans involve land sale installment contracts, they are, as a technical matter, loans enforced by a forfeiture rather than a foreclosure. (*Department of Veterans Affairs* v. *Duerksen, supra,* 138 Cal.App.3d at p. 157 ["The simple fact is that the Legislature has, by section 987.77, expressly authorized the Department to force a forfeiture when a veteran breaches his Cal-Vet contract."].) Indeed, the applicable statute, section 987.77, provides for a classic forfeiture remedy. ("All payments theretofore made shall be deemed to be rental paid for occupancy.")

However, when read in conjunction with section 2920, subdivision (b) of the Civil Code, it is clear that a Cal-Vet sales contract is still, in reality, a mortgage. That statute provides that "any security device or instrument, other than a deed of trust, that confers a power of sale . . . after a breach of the obligation" is a mortgage for purposes of default (see also Civ. Code, § 2924).

As Civil Code section 2920 would lead one to believe, the department clearly acts as a lender, as distinct from owner, on a Cal-Vet loan. The veteran retains control and actual possession of the property; he or she has all the indicia of ownership except legal title.

Accordingly, we must agree with the trial court that because the department functions as a lender, not an owner, it is not bound by the CC&R's.[15] The department only had options against *Cunningham's* poor management of the property, not obligations. The department did not control how Cunningham kept house, he did. The idea that *it* might be held responsible as a kind

---

[14]The statute is very clear that the power is discretionary, not mandatory. Section 987.75 provides in pertinent part: "If the purchaser fails or neglects to pay . . . [or] satisfy . . . all . . . assessments, and all other charges and encumbrances which are a lien upon the property being purchased from the department . . . or to keep the buildings . . . in good order and repair . . . then, in such event, the department *may* pay . . . [or] satisfy . . . assessments, charges, or encumbrances." (Italics added.)

[15]We certainly do not discern any blanket rule, however, that anyone who can be styled in some sense as a "lender" is automatically free of the CC&R's. A much harder case, for example, would be one where a homeowner leased out his or her residence with an option to buy.

of backup enforcement arm to the homeowners association is simply a makeweight to support a claim against the department for legal fees.

Our conclusion should hardly serve as some novel legal sunburst. Anyone who has ever bought a home would understand that the true legal substance of the veteran's loan obtained by Cunningham was to make him the owner of the house, with the department being the lender, even if technical legal title were retained in the department as a security device. The law always favors substance over form as a general rule in any event (see Civ. Code, § 3528), but here we even have a specific statute, Civil Code section 2920, subdivision (b), which mandates that we look to the substance of an installment sales contract as well. The trial judge was, accordingly, correct in rendering judgment for the department.

### DISPOSITION

The judgment in favor of the department is affirmed. The department is to recover its costs on appeal.

Let a peremptory writ of mandate issue directing the trial court to vacate the order granting the association's new trial motion and to enter a new and different order denying the motion, and to proceed with the second half of the bifurcated trial on the issue of damages. Cunningham is to recover his costs.

Because the trial judge predetermined that Cunningham was to lose, we direct the presiding judge of the superior court to reassign the case to another judge for further proceedings. (Code Civ. Proc., § 170.1, subd. (c).)

Wallin, J., and Bedsworth, J., concurred.

A petition for a rehearing was denied November 30, 1998, and the petition of real party in interest for review by the Supreme Court was denied January 27, 1999. Kennard, J., was of the opinion that the petition should be granted.