Filed 1/13/14  Fulton v. State of California, Dept. of Transportation CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| MICHAEL TODD FULTON et al., | D062592 |
| Plaintiffs and Respondents, | |
| v. | (Super. Ct. No. 37-2011-00066823-CU-PO-EC) |
| STATE OF CALIFORNIA, DEPARTMENT OF TRANSPORTATION, | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of San Diego County, Joel R. Wohlfeil, Judge.  Affirmed in part and reversed in part.

Ronald A. Beals, Jeffrey R. Benowitz and Glenn B. Mueller for Defendant and Appellant.

Estey & Bomberger, Stephen J. Estey, R. Michael Bomberger and Ljubisa Kostic; Law Offices of Courtney Yoder and Courtney Yoder for Plaintiffs and Respondents.

Plaintiffs Michael and Susanna Fulton (separately Michael and Susanna; together the Fultons) were injured when the motorcycle they were riding collided with a car

turning west from Deer Canyon Drive onto State Highway 78 (SR-78). Their claim

against defendant California Department of Transportation (Caltrans) asserted Caltrans

created a dangerous condition at the intersection of SR-78 and Deer Canyon Drive (the

intersection) by approving construction of the intersection in a configuration that did not

provide adequate "sight distances" for users of the roads. The jury found, by special

verdict, that the intersection was not in a dangerous condition at the time of the accident.

However, the trial court granted the Fultons' posttrial motions for judgment

notwithstanding the verdict (JNOV) and for a new trial. This appeal by Caltrans

followed.

## I

## FACTUAL BACKGROUND

A. The Accident

On the day of the accident, Larry McClellan was driving his Jeep west on SR-78

when he saw a sign advertising an estate sale on Deer Canyon Drive. He had never

before driven on that road. He turned onto Deer Canyon Drive and went to the estate

sale, where he stayed for about 20 minutes. After leaving the estate sale, McClellan

drove north on Deer Canyon Drive to SR-78. When his car reached the intersection,

McClellan prepared to turn left to the west onto SR-78 by slowing his car and looking

both ways. He pulled out further into the eastbound lane of SR-78, approximately two to

six feet past the "fog line," to get a better view of oncoming traffic.[1] The Fultons'

_____

1      There were two slightly conflicting versions of McClellan's actions as he
approached, and then pulled into, the eastbound lane of SR-78. According to McClellan,

2

motorcycle, headed eastbound on SR-78, collided with McClellan's car in the eastbound lane of SR-78. The Fultons have little recollection of the accident. The physical evidence showed a straight tire mark measuring 62 feet, which the motorcycle left behind it as it tried to stop. The tire mark ended a foot or two west of the west boundary of the intersection, suggesting McClellan's Jeep was near the west boundary of Deer Canyon Drive when the collision occurred.

The posted speed limit along SR-78 at the intersection is 55 m.p.h.. Both accident reconstruction experts apparently agreed Michael was not speeding at the time of the accident, and was not at fault in the collision but simply lacked sufficient time and distance to stop or avoid the collision after McClellan pulled into the eastbound lane in front of him.

B. The Alleged Dangerous Condition

In 1989 Caltrans issued an encroachment permit to allow Deer Canyon Drive, then an existing private road, to be "upgraded to current Caltrans standards" and to be joined to SR-78 "as shown on the attached plans, in accordance with the requirements and

---

he stopped his Jeep just before the fog line, looked right-left-right, and then pulled forward and crossed the fog-line (going several feet into the eastbound lane) and stopped a second time to recheck for oncoming traffic. The motorcycle struck the Jeep while it was stopped this second time, and McClellan never saw the motorcycle until immediately before impact. Mr. Harrington, who was traveling westbound near the intersection and witnessed the accident, believed McClellan never looked to the left (i.e. the direction from which the Fultons were approaching) or came to a stop before entering the highway. Instead, Harrington testified it was his impression the Jeep driver only looked right (i.e., toward Harrington's oncoming car) and hurried onto the highway trying to enter the westbound lane in front of Harrington's car. Although the parties each championed their respective versions of McClellan's actions, and his precise conduct would have been relevant to issues of causation and comparative fault, the issue raised in this appeal does not require us to delve into this disputed factual issue.

3

conditions contained herein and as further directed or approved by the State's inspector . . . ."  One of the conditions specified by Caltrans when it issued the permit was that "[a] minimum sight distance of *360 feet as shown on the attached detail* shall be maintained . . . ."  (Italics added.)

The Highway Design Manual (HDM), one of the reference materials used by Caltrans when evaluating whether to issue an encroachment permit, contains both mandatory and advisory design rules to ensure the requested encroachment will be safe for motorists.  When the "design speed" of the highway is 55 m.p.h., the HDM provides that the "standards for stopping sight distance" for intersections onto the highway "shall be" 500 feet in both directions.  However, when the "design speed" is 50 m.ph., the stopping sight distance shall be 430 feet, and when the "design speed" is 45 m.ph., the stopping sight distance shall be 360 feet.

Although the posted speed limit for SR-78 at the intersection where Deer Canyon Drive connects with the highway was 55 m.p.h., the encroachment permit stated the "estimated approach speed [is] 45-50 mph for eastbound traffic."  Accordingly, the permit stated the entrance, which "may have to be adjusted to satisfy sight distance requirements" for eastbound traffic, must provide "a minimum sight distance of 360 ft according to topic 405.1 and figure 405.7 of [the HDM]".

C. The Principal Issue: The Dispute over Caltrans's Approvals of the Design and Build-Out of the Intersection

The Fultons asserted two alternative theories for arguing the intersection was a dangerous condition: Caltrans approved a design for the intersection that was unsafe, and

4

Caltrans accepted the intersection as it was actually constructed even though it did not comply with the approved design.

First, Caltrans approved a design for the intersection that the Fultons asserted, and Caltrans disputed, did not adhere to the standards the HDM required for a safe sight distance from the intersection along the eastbound lanes of SR-78. The Fultons argued that because the posted speed limit was 55 m.p.h., the HDM required a sight distance of 500 feet; however, Caltrans instead approved a design that called for only 360 feet, because Caltrans designated the "approach speed" for eastbound traffic to be 45-50 m.p.h. The Fultons called Mr. Markey (the Caltrans supervisor who supervised the review of the permit application) to testify Mr. Fisher (Markey's subordinate) was the Caltrans employee responsible for reviewing and approving the permit application, and that it was Fisher who decided to designate the "approach speed" for eastbound traffic at 45-50 m.p.h. for this location. However, Markey conceded he did not know why Fisher had selected an approach speed below the posted speed limit and had found no evidence Fisher ordered or conducted any speed surveys for the location that showed the actual speeds of drivers approaching that location were 45 to 50 m.p.h. In rebuttal, Caltrans asserted Fisher's selection of the approach speed of 45 to 50 m.p.h. (and therefore the selection of the corresponding sight distance of 360 feet under the HDM),[2] approved by

_____

[2]    Markey conceded the HDM did not employ the term "approach speed" when selecting stopping sight distances, but instead used the term "design speed." However, he testified the approach speed selected by Fisher was the "design speed looking at . . . required sight distance" or the "design speed for the road approach" in this particular case. Markey testified it was necessary to know the approach speed "to provide the

5

Markey, was appropriate despite the higher posted speed limit because there was evidence that drivers actually adhered to a speed at the location of the intersection lower than the 55 m.p.h. posted speed limit.[3]

The Fultons alternatively argued that, even assuming 360 feet was an appropriate sight distance, Caltrans inspected and approved the final as-built road even though the intersection did not *actually* meet the 360-foot minimum sight distance required by the permit. Instead, several witnesses explained that Deer Canyon Drive as built provided only between 287 and 320 feet of sight distance.[4] Caltrans nevertheless approved the

---

correct sight distance [because] [o]therwise, you would have to basically assume the maximum and apply that."

[3] Caltrans also cites testimony from Mr. Seegmiller that design speeds can differ from posted speed limits, and that "a potential situation on older highways" could occur in which where the design speed for a segment of a highway would be lower than the posted speed limit. However, Seegmiller explained that "in general" Caltrans does not want the design speed to be below the posted limit. Moreover, when asked if it was "common" to have design speeds lower than the posted speed limit on segments of older highways, Seegmiller conceded he was "not really an expert in that area." Indeed, his testimony supported a conclusion that, when the posted speed limit *does* exceed a safe speed based on the design of a segment of the road, warning signs calling for a reduced speed for that segment are an appropriate safety measure. There was no sign warning drivers on SR-78 approaching Deer Canyon Drive to reduce their speed below the posted limit.

[4] The variations in sight distance appear to be attributable to the methodology employed by the witnesses to conduct the measurement. Mr. Dickerson (the Fultons' accident reconstruction expert), testified he used surveying equipment and followed Caltrans's protocol and specifications for the permit by putting a camera in Deer Canyon Drive 15 feet back from the south edge of SR-78, and just west of the mailboxes, with the camera raised 3.5 feet above the ground, to measure when an object first became visible as it approached from the west heading eastbound on SR-78. He determined (using Caltrans's protocols and specifications) the stopping sight distance for eastbound traffic from Deer Canyon Drive was only 300 feet. The accident reconstruction expert for

intersection as built. Caltrans produced no evidence at trial that the actual stopping sight distance for Deer Canyon Drive, when measured in accordance with Caltrans's protocol, satisfied the 360-foot requirement contained in the permit.[5]

---

Caltrans, Mr. Reust, agreed the sight distances were between 287 and 294 feet when measured from Deer Canyon Drive just west of the mailboxes. A third witness, Mr. Ryan, testified as a forensic engineering expert on how the roadway configuration may have contributed to the collision. He explained that stopping sight distances under the HDM are measured using a point at the center line of the mainline pavement and a point 15 feet back from the edge of the road. He knew the permit called for a sight distance appropriate for a 45 m.p.h. speed. However, when Ryan visited the site, he questioned whether the permittee had actually "buil[t] what they said they were going to build" because "it didn't even look like 45," so he made a "rough measurement" of sight distance using a "rollo tape" and came up with around 320 feet.

[5] On appeal, Caltrans asserts the Fultons' own expert, Mr. Ryan, testified that if McClellan had used a dirt path on the eastern side of the mailboxes to enter SR-78, there could have been 360 feet or more of sight distance. However, Caltrans did not interpose this argument below in opposition to either the new trial motion or the motion for JNOV, and we therefore deem the argument waived. (*Bogacki v. Board of Supervisors* (1971) 5 Cal.3d 771, 780 [general rule that argument may not be raised for first time on appeal "is to be stringently applied when the new theory depends on controverted factual questions whose relevance thereto was not made to appear at trial"].) More importantly, even had this claim been preserved below, the argument misconstrues Ryan's testimony. Ryan testified, apparently without contradiction, that the *only* place on Deer Canyon Drive the sight distance measurement could properly commence to satisfy the permit criteria was from the middle of the permitted encroachment. He explained that, while a larger sight distance might be obtained if the measurement was taken from some undefined point *east* of the permitted encroachment, that would not be a proper method for determining if the permit requirements had been satisfied because such a starting point would be located on private property that was never part of the Deer Canyon Drive easement underlying the Caltrans permit. Indeed, contrary to Caltrans's argument that Ryan testified there was 360 feet of sight distance from an eastern point, Ryan testified he never measured sight distances from such a point, and thus his surmises concerning sight distances from an eastern point were speculation.

D. Other Relevant Evidence[6]

The parties stipulated the speed limit for SR-78 was 55 m.p.h. and there was no signage of any kind for eastbound traffic in the 3,000 feet prior to meeting Deer Canyon Drive.[7] Caltrans showed that, in the 10 years preceding the accident, there were no similar accidents involving cars turning onto SR-78 from Deer Canyon Drive colliding with eastbound motorists.

## II

## GOVERNING STANDARDS

A. Dangerous Condition

Government Code section 835 provides that a public entity is "liable for injury caused by a dangerous condition of its property if the plaintiff establishes that the property was in a dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either: [¶]

---

[6]     Caltrans devotes significant time on appeal discussing the evidence showing that McClellan may have been negligent in choosing his route over Deer Canyon Drive or in not looking before entering onto SR-78. Although that evidence would be germane to questions of apportioning fault, it is irrelevant to the issue of the presence or absence of a dangerous condition. (See, e.g., *Bonanno v. Central Contra Costa Transit Authority* (2003) 30 Cal.4th 139, 153, fn. 5.) Because the latter issue was the only question reached by the jury and the only issue in dispute when the trial court entered the orders granting the motions for JNOV and new trial, we do not detail the evidence relevant to causation or comparative fault.

[7]     The jury was instructed it could consider the lack of a regulatory traffic control signal, stop sign, yield right of way sign or speed restriction sign, along with all of the other circumstances, to assess whether the intersection was in a dangerous condition.

8

(a) A negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or [¶] (b) The public entity had actual or constructive notice of the dangerous condition . . . a sufficient time prior to the injury to have taken measures to protect against the dangerous condition."

The element at issue here is the existence of a dangerous condition. A "[d]angerous condition" is defined as "a condition of property that creates a substantial (as distinguished from a minor, trivial or insignificant) risk of injury when such property . . . is used with due care in a manner in which it is reasonably foreseeable that it will be used." (Gov. Code, § 830, subd. (a).) The existence of a dangerous condition is ordinarily a question of fact and, where reasonable minds can differ on whether the conditions surrounding the public property posed a substantial risk of injury to foreseeable users exercising due care, the issue of dangerous condition must be left to the trier of fact. (*Huffman v. City of Poway* (2000) 84 Cal.App.4th 975, 991-993.)

B. Standards of Review

We evaluate Caltrans's appeal from two distinct orders: the order granting the Fultons' motion for a new trial, and the order granting the Fultons' motion for partial JNOV, which in effect ruled the intersection constituted a dangerous condition as a matter of law.

Motions for JNOV and for a new trial require different procedures for obtaining "a judgment contrary to the verdict rendered by a jury" (*Teitel v. First Los Angeles Bank* (1991) 231 Cal.App.3d 1593, 1602), involve significantly different standards at both the trial court level and on appeal. "A new trial motion allows a judge to disbelieve

9

witnesses, reweigh evidence and draw reasonable inferences contrary to that of the jury, and still, on appeal, retain a presumption of correctness that will be disturbed only upon a showing of manifest and unmistakable abuse." (*Fountain Valley Chateau Blanc Homeowner's Assn. v. Department of Veterans Affairs* (1998) 67 Cal.App.4th 743, 751 (*Fountain Valley*).)  "The court may grant a new trial even though there [is] sufficient evidence to sustain the jury's verdict on appeal, so long as the court determines the weight of the evidence is against the verdict." (*Candido v. Huitt* (1984) 151 Cal.App.3d 918, 923.)  On appeal, we accord wide latitude to the trial court's order granting a new trial motion and we will not disturb its ruling on appeal absent an abuse of discretion. (*Fountain Valley, supra*.)

JNOV motions involve significantly different standards for both the trial court and the appellate court.  A JNOV motion permits a party to prevail when the evidence is legally insufficient to support the verdict. (*Fountain Valley, supra*, 67 Cal.App.4th at p. 751.)  The trial court's power to grant a JNOV motion is "severely limited" (*Teitel v. First Los Angeles Bank, supra,* 231 Cal.App.3d at p. 1603), and may only be granted where there is no substantial evidence to support the verdict. (*Tognazzini v. San Luis Coastal Unified School Dist.* (2001) 86 Cal.App.4th 1053, 1057-1058.)  In other words, "the court essentially rules the plaintiff *never* can prevail, even if the matter were to be retried." (*Dell'Oca v. Bank of New York Trust Co., N.A.* (2008) 159 Cal.App.4th 531, 548 (italics added).)  In deciding whether to grant the motion, the trial court cannot weigh the evidence or assess the credibility of witnesses (*Castro v. State of California* (1981) 114 Cal.App.3d 503, 512), and must view the evidence in the light most favorable to the

10

verdict, disregard conflicting evidence and indulge every legitimate inference to support the verdict. (*Paykar Construction, Inc. v. Spilat Construction Corp.* (2001) 92 Cal.App.4th 488, 493-494.) When the evidence is in conflict or there are several reasonable inferences that may be drawn from the evidence, and there is evidence or inferences that could support the verdict, the court must deny the JNOV motion. (*Clemmer v. Hartford Insurance Co.* (1978) 22 Cal.3d 865, 877-878.) On appeal, we determine de novo whether there was any substantial evidence to support the verdict and may affirm only if the evidence and inferences, viewed in the light most favorable to party in whose favor the verdict was entered, demonstrate the moving party was entitled to judgment in its favor as a matter of law. (*Ibid.*)

III

THE GRANT OF THE PARTIAL JNOV MOTION WAS ERROR

The court's order purported to grant a JNOV on the issue of the existence of a dangerous condition, and in effect ruled the facts at trial showed the intersection was dangerous as a matter of law. We conclude, even assuming the court had the power to enter this order,[8] the ruling was error.

---

[8]    Because we conclude the order granting partial JNOV was substantively erroneous, we need not evaluate the separate issue of whether the order was procedurally infirm. The Fultons asserted below, and reassert on appeal, that under *Beavers v. Allstate Ins. Co.* (1990) 225 Cal.App.3d 310, 332, a partial JNOV may be granted. Although a court might have the power to grant a partial JNOV "where appropriate" (*Hansen v. Sunnyside Products, Inc.* (1997) 55 Cal.App.4th 1497, 1510 [grant of partial JNOV on issue of "comparative fault" reversed]), we have substantial doubts whether this ruling here, which essentially amounted to a partial directed verdict that has yet to be incorporated into a final judgment, was an "appropriate" case. (Cf. *Dell'Oca v. Bank of New York Trust Co., N.A., supra,* 159 Cal.App.4th at pp. 552-556.) However, because

11

First, there was some evidence that, if credited, would support the designation of a 360-foot stopping sight distance requirement. The HDM designates a 360-foot stopping sight distance for speeds of 45 m.p.h., and Mr. Fisher (the person with the apparent initial responsibility for imposing the permit's stopping sight distance requirement) stated the approach speed was 45-50 m.p.h., and Fisher's selection of that approach speed was approved by Fisher's supervisor (Mr. Markey). A trier of fact could reasonably have inferred Fisher did not act arbitrarily or capriciously when he selected that approach speed, but instead made that determination based either on his personal knowledge of the particular stretch of road or on his observations of driver behavior patterns for eastbound traffic,[9] which rendered unnecessary any formalized speed studies for that stretch of road.

More importantly, the Fultons' claim against Caltrans required proof that the condition of this intersection created "a substantial . . . risk of injury when such property . . . is used with due care in a manner in which it is reasonably foreseeable that it will be used" (§ 830, subd. (a)), and *not* merely proof of whether HDM guidelines were adhered to in the design and construction of this intersection. Thus, we must examine whether there was evidence and inferences from which a reasonable trier of fact could conclude

Caltrans neither contested the procedural propriety of a grant of partial JNOV at trial nor raised any such challenge on appeal, we do not further examine this procedural issue.

[9] The inference that actual approach speeds were below posted limits finds additional evidentiary support from Michael's own testimony. He testified he had ridden along SR-78 many times and had thought (at least until he was corrected by his attorney during the pendency of the lawsuit) the speed limit was 45 m.p.h. on the relevant stretch of road.

that, notwithstanding a shorter stopping sight distance than specified by the HDM standards, the condition of this intersection did not create a substantial risk of injury when used with due care. A rational jury could have concluded, from the fact drivers emerging onto SR-78 from Deer Canyon Drive as built had 100 yards of vision in which to observe approaching eastbound drivers, that such drivers who look left toward eastbound traffic would spot an approaching eastbound vehicle approximately four to five seconds before the eastbound vehicle reached Deer Canyon Drive, and that this four-to-five-second lead would give a driver using due care sufficient warning to know he or she could not safely proceed across SR-78. Accordingly, there was some evidence from which a trier of fact could conclude the condition of this intersection did not create a substantial risk of injury when used with due care. (Cf. *Huffman v. City of Poway, supra,* 84 Cal.App.4th at pp. 991-993 [existence of dangerous condition is ordinarily question of fact and where reasonable minds can differ on whether conditions surrounding public property pose substantial risk of injury to foreseeable users exercising due care issue of dangerous condition must be left to trier of fact].)

Moreover, such a conclusion finds additional support from the evidence that there had been no prior accidents at this intersection in at least 10 years of use.[10] (See, e.g., *Antenor v. City of Los Angeles* (1985) 174 Cal.App.3d 477, 482 [inquiry into the question

[10]    We recognize the Fultons sought to minimize the absence of prior accidents by evidence that traffic volumes from Deer Canyon Drive were relatively low, as well as evidence that experienced users of the intersection may have used a self-created addition that increased sight distances. However, because a trier of fact may evaluate the credibility of this evidence as well as to accord it the weight it believed was appropriate, the trier of fact was not required as a matter of law to ignore the accident-free history of this intersection.

13

of dangerousness involves consideration of such matters as whether the condition has been the cause of other accidents]; *Sambrano v. City of San Diego* (2001) 94 Cal.App.4th 225, 243 [evidence of the absence of prior accidents over five-year period is relevant to the definition of a dangerous condition under § 830, subd. (a)].)  Although the absence of prior accidents is not *dispositive* of whether a dangerous condition exists (see, e.g., *Lane v. City of Sacramento* (2010) 183 Cal.App.4th 1337, 1346), it is relevant evidence a trier of fact could credit when assessing whether a dangerous condition exists.

We conclude there was some evidence that, if credited by a trier of fact, would have supported the conclusion the conditions surrounding the intersection did not pose a substantial risk of injury to foreseeable users exercising due care.  Because the evidence was therefore not insufficient as a matter of law to support the verdict (*Fountain Valley, supra*, 67 Cal.App.4th at p. 751), the trial court's order purporting to grant a partial JNOV and finding there existed a dangerous condition as a matter of law must be reversed.

IV

THE GRANT OF THE MOTION FOR NEW TRIAL
WAS NOT AN ABUSE OF DISCRETION

Although there was evidence and inferences from which a trier of fact could have concluded there was not a dangerous condition at the intersection, making the JNOV order erroneous, the trial court's evaluation of Fulton's motion for new trial stood on a different footing.  Unlike the JNOV motion, a trial court deciding a new trial motion is permitted "to *disbelieve* witnesses, *reweigh* evidence and draw reasonable inferences *contrary* to that of the jury . . ."  (*Fountain Valley, supra,* 67 Cal.App.4th at p. 751, italics

14

added.)  Thus, unlike the JNOV motion, a court may grant a new trial "even though there [is] sufficient evidence to sustain the jury's verdict on appeal, so long as the court determines the weight of the evidence is against the verdict."  (*Candido v. Huitt, supra,* 151 Cal.App.3d at p. 923.)

The trial court here granted the Fultons' motion for new trial on the ground that the evidence was insufficient to justify the verdict that the property was not in a dangerous condition.  The court specified, as its reasons for concluding the evidence was insufficient, that (1) the actual stopping sight distance for Deer Canyon Drive was only between 287 and 320 feet, (2) the HDM requires a stopping sight distance of 500 feet for a 55 m.p.h. zone and no deviation from this mandatory stopping sight distance was approved under Caltrans's procedures for granting exceptions to stopping sight distances, (3) the permit assigned a stopping sight distance of 360 feet based on a 45-50 m.p.h. approach speed without any evidence that Caltrans justified the selection of this speed with any speed surveys, and (4) the *actual* sight stopping distance would only have sufficed for a design speed of 40 m.p.h., below *both* the posted speed limit *and* the "approach speed" estimate.  Because the court's new trial order essentially concluded there was no evidence that either the permitted sight stopping distance of 360 feet or the actual sight stopping distance of 287 to 320 feet were adequate stopping sight distances for the design speed for this segment of road, and because the court concluded the absence of prior accidents was not necessarily determinative of the existence of a dangerous condition, it held the evidence did not justify the verdict on the issue of a dangerous condition and ordered a new trial.

15

Caltrans argues the order granting a new trial was an abuse of discretion because (1) the stated reasons (even if factually supported) would be inadequate to support the new trial order, and (2) the undisputed facts show the stated reasons did not have evidentiary support. Caltrans's first argument--that the reasons recited by the trial court are inadequate to support the order granting a new trial--rests on its view that because the principal reason cited by the trial court for the new trial order was that the stopping sight distance did not meet the HDM standards, the trial court must have concluded such noncompliance created a per se dangerous condition. From that predicate, the Fultons argue the standard for a dangerous condition is *not* compliance with HDM standards, but is instead whether the conditions surrounding the intersection posed a substantial risk of injury to foreseeable users exercising due care. However, we are not persuaded by Caltrans's predicate because we do not share its interpretation of the court's stated reasons.[11] The court did rely on the actual stopping sight distance of between 287 to 320

[11] A new trial order must state the ground or grounds on which it is based, and contain a statement of reasons supporting the stated ground. (*Oakland Raiders v. National Football League* (2007) 41 Cal.4th 624, 634.) "A statement of grounds that reasonably approximates the statutory language is sufficient. [Citations.] The statement of 'reasons,' on the other hand, should be specific enough to facilitate appellate review and avoid any need for the appellate court to rely on inference or speculation." (*Ibid*.) The statement of reasons need not " 'cite page and line of the record, or discuss the testimony of particular witnesses,' nor . . . undertake 'a discussion of the weight to be given, and the inferences to be drawn from each item of evidence supporting, or impeaching, the judgment.' " (*Scala v. Jerry Witt & Sons, Inc.* (1970) 3 Cal.3d 359, 370.) Instead, the requisite statement of reasons is sufficient as long as it provides a basis for meaningful review of the order by informing the parties and the reviewing court of why the trial court found the evidence to be insufficient, and thereby enables the parties "to discuss intelligently the question whether there was any substantial evidence to support the judge's reasons." (*Meiner v. Ford Motor Co.* (1971) 17 Cal.App.3d 127, 137.) "When the trial court provides a statement of reasons as required . . . , the appropriate

16

feet, and did compare that distance to HDM standards for the posted speed limit on SR-78, the "approach speed" mentioned in the permit, and the speed at which 300 feet would be acceptable under the HDM. However, we construe this recitation of the evidence as comprising the court's explanation of what evidence it factored into its conclusion that, after *reweighing* the evidence and drawing reasonable inferences *contrary* to those of the jury (*Fountain Valley, supra,* 67 Cal.App.4th at p. 751), the evidence did not justify the verdict that the conditions surrounding the intersection did not pose a substantial risk of injury to foreseeable users exercising due care.

For example, the court was entitled to conclude Fisher assigned a 360-foot sight stopping distance, but did so based on an "approach speed" of 45-50 m.p.h. without any evidence Fisher had a factual basis for deciding to lower the sight stopping distance nearly 30 percent below recommended limits for the nominal speed limit, and that such reduction created a trap for drivers who used due care on Deer Canyon Drive but were inexperienced in the hazards posed by reduced sight limits. More importantly, the court was entitled to conclude that reducing this *already* compressed 360-foot sight stopping distance by *another* 20 percent, based on the evidence the sight stopping distance for Deer Canyon Drive as *actually* built was around 300 feet, exacerbated the danger created by drivers who used due care on Deer Canyon Drive but were inexperienced in how to avoid the hazards posed by reduced sight limits. Although we agree with Caltrans that noncompliance with HDM guidelines does not establish a dangerous condition as a

standard of judicial review is one that defers to the trial court's resolution of conflicts in the evidence and inquires only whether the court's decision was an abuse of discretion." (*Oakland Raiders,* at p. 636.)

17

matter of law, we believe a trial court, sitting as trier of fact on a new trial motion to assess the presence or absence of a dangerous condition, was entitled to give substantial weight to the fact that the stopping sight distances at the intersection were substantially below the stopping sight distances professionals have determined are appropriate to provide for safe intersections.

A trial court has the power to grant a new trial when, in the opinion of the court sitting as a 13th juror, the weight of the evidence appears to be contrary to the jury's determination. (*Barrese v. Murray* (2011) 198 Cal.App.4th 494, 503.) "The powers of a trial court in ruling on a motion for new trial are plenary. The California Supreme Court has held that the trial court, in ruling on a motion for new trial, has the power 'to disbelieve witnesses, reweigh the evidence, and draw reasonable inferences therefrom contrary to those of the trier of fact' (*Mercer v. Perez* (1968) 68 Cal.2d 104, 112 . . .) that the court sits as 'an independent trier of fact' (*Neal v. Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 933 . . .) and that it must 'independently [assess] the evidence supporting the verdict' (*People v. Lagunas* (1994) 8 Cal.4th 1030, 1038 . . .). The trial judge has 'to be satisfied that the evidence, as a whole, was sufficient to sustain the verdict; if he was not, it was not only the proper exercise of a legal discretion, but his duty, to grant a new trial.' (*People v. Lum Yit* (1890) 83 Cal. 130, 134 . . . .)" (*Ibid.*) Because the existence of a dangerous condition is ordinarily a question of *fact* that must be left to the trier of fact when reasonable minds can differ over whether the conditions surrounding the public property posed a substantial risk of injury to foreseeable users exercising due care (*Huffman v. City of Poway, supra,* 84 Cal.App.4th at pp. 991-993), and the trial court

here was required to sit as the "13th juror" to assess whether the evidence showed the conditions surrounding the public property posed a substantial risk of injury to foreseeable users exercising due care, its recitation of the evidence upon which it relied in reassessing this factual question was adequate to support the order granting a new trial.

Caltrans alternatively argues there was no evidence to support the factual underpinnings of the court's stated reasons, and therefore the order granting a new trial was an abuse of discretion. Caltrans claims the evidence was undisputed that (1) the design speed for the intersection was 45 m.p.h., (2) the HDM standard calls for 360 feet of stopping sight distance for that design speed, and (3) there was no evidence to rebut Ryan's testimony there was 360 feet of stopping sight distance at Deer Canyon Drive. Caltrans is correct that the HDM standard calls for 360 feet of stopping sight distance for a design speed of 45 m.p.h., but overlooks that the court was entitled to infer the assignment of that speed to a stretch of road with a posted speed limit of 55 m.p.h. was done without verifying (through speed studies or otherwise) 45 m.p.h. was an appropriate assessment of the speeds for that stretch of road. More importantly, Caltrans's claim no evidence rebutted Ryan's testimony there was 360 feet of stopping sight distance at Deer Canyon Drive is meritless. There was evidence from which the trial court, as the "13th juror," could conclude there was substantially less stopping sight distance than called for in the permit. Ryan specifically rejected Caltrans's effort to claim there was 360 feet of sight distance, explaining the *only* place on Deer Canyon Drive from which to properly begin measuring the sight stopping distance measurement under the permit criteria was from the middle of the permitted encroachment. The testimony from other witness

19

supported that conclusion. (See fn. 4, *ante*.) Thus, Ryan explained that although a 360-foot stopping sight distance might be obtained if the measurement was taken from some easterly point outside of the permitted encroachment, that would not be a proper method for determining if the permit requirements had been satisfied, and there was ample evidence that sight distances as properly measured were below 360 feet. On this record, the trial court did not abuse its discretion when, after reweighing the evidence, it concluded the weight of the evidence was against the verdict and that a new trial was therefore appropriate.

## DISPOSITION

The order granting the Fultons' motion for judgment notwithstanding the verdict is reversed. The order granting the Fultons' motion for a new trial is affirmed. Each party shall bear its own costs on appeal.

McDONALD, J.

WE CONCUR:

BENKE, Acting P. J.

AARON, J.